## GALVAN *v.* PRESS, OFFICER IN CHARGE, IMMIGRATION AND NATURALIZATION SERVICE.

No. 407.   Argued January 11–12, 1954.—Decided May 24, 1954.

*Harry Wolpin* and *A. L. Wirin* argued the cause for petitioner. With them on the brief were *Morris L. Ernst* and *Osmond K. Fraenkel.*

*Oscar H. Davis* argued the cause for respondent. With him on the brief were *Robert L. Stern,* then Acting Solicitor General, *Assistant Attorney General Olney* and *Beatrice Rosenberg.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Petitioner, an alien of Mexican birth, first entered the United States in 1918 and has since resided here with only occasional brief visits to his native country. In the course of two questionings, in March 1948, by the Immigration and Naturalization Service, he indicated that he had been a member of the Communist Party from 1944 to 1946. In March of 1949, the petitioner was served with a deportation warrant, and on the same day a preliminary deportation hearing was held to acquaint him with the charges against him—that after entry he had become a member of an organization which advocated the violent overthrow of the United States Government, and of an organization which distributed material so advocating. In December 1950, petitioner had a *de novo* hearing at which the transcripts of all earlier proceedings were, by agreement, made part of the record. Shortly after the hearing commenced, the Examining Officer lodged the additional charge against the petitioner that after entry he had been a member of the Communist Party, membership in which had been made a specific ground for deportation by the Internal Security Act of 1950, 64 Stat. 987, 1006, 1008.

At this final hearing the evidence against the petitioner was derived from two principal sources. The first was

his own testimony during the two interrogations by immigration authorities in 1948. During those interrogations, he had testified as to the time and place he had joined the Communist Party, talked freely about his membership in the Party, and indicated generally that the distinction between the Party and other groups was clear in his mind; he had explained that the reason he had not applied for naturalization was that he feared his former Party membership might be revealed, and had offered to make amends by rejoining the Party as an undercover agent for the Government. At the hearing in December of 1950, petitioner denied that in his prior hearing he had admitted joining the Party, insisting that at the time he thought the question related to labor union activities. In response to a question whether he had ever attended meetings of the Spanish Speaking Club, an alleged Communist Party unit, he replied: "The only meetings I attended were relating to the Fair Employment Practices Committee."

The second source of information was the testimony of a Mrs. Meza to the effect that she had been present when petitioner was elected an officer of the Spanish Speaking Club. Petitioner denied the truth of this and other statements of Mrs. Meza calculated to establish his active participation in the Communist Party and said: "She must have been under great strain to imagine all those things."

The Hearing Officer found that petitioner had been a member of the Communist Party from 1944 to 1946 and ordered him deported on that specific ground. He did not deem it necessary to make findings on the more general charges contained in the original warrant. The Hearing Officer's decision was adopted by the Assistant Commissioner and an appeal was dismissed by the Board of Immigration Appeals. A petition for a writ of habeas corpus was denied by the District Court, and the dismissal

was affirmed by the Court of Appeals for the Ninth Circuit. 201 F. 2d 302.

On certiorari, petitioner challenged the sufficiency of the evidence to sustain deportation under § 22 of the Internal Security Act of 1950 and attacked the validity of the Act as applied to him.[1] These are issues that raise the constitutionality and construction of the 1950 Act for the first time and so we granted certiorari. 346 U. S. 812.

Petitioner's contention that there was not sufficient evidence to support the deportation order brings into question the scope of the word "member" as used by Congress in the enactment of 1950, whereby it required deportation of any alien who at the time of entering the United States, or at any time thereafter, was a "member" of the Communist Party.[2] We are urged to construe the Act as providing for the deportation only of those aliens who joined the Communist Party fully conscious of its advocacy

---

[1] In his petition, petitioner also contended that the procedure used against him was unfair because of the new charge lodged by the Examining Officer in the December 1950 hearing. Apart from the fact that this claim was not pressed in the argument or petitioner's brief, it is sufficient to note that there was no element of surprise in the additional charge, since it was simply in more specific terms the same ground for deportation that petitioner already knew he had to defend against, namely, membership in the Communist Party. Furthermore, petitioner declined the Hearing Officer's offer of a continuance to meet the new charge.

[2] Section 22 of the Internal Security Act of 1950 provides that the Attorney General shall take into custody and deport any alien "who was at the time of entering the United States, or has been at any time thereafter, . . . a member of any one of the classes of aliens enumerated in section 1 (2) of this Act . . . ."

Subparagraph (C) of § 1 (2) lists "Aliens who are members of or affiliated with (i) the Communist Party of the United States . . . ." The substance of this provision was incorporated in the Immigration and Nationality Act of 1952, 66 Stat. 163, 205, 8 U. S. C. § 1251 (a) (6) (C).

of violence, and who, by so joining, thereby committed themselves to this violent purpose.

But the Act itself appears to preclude an interpretation which would require proof that an alien had joined the Communist Party with full appreciation of its purposes and program. In the same section under which the petitioner's deportation is sought here as a former Communist Party member, there is another provision, subsection (2)(E), which requires the exclusion or deportation of aliens who are "members of or affiliated with" an organization required to register under the Internal Security Act of 1950,[3] "unless such aliens establish that they did not know or have reason to believe at the time they became members of or affiliated with such an organization . . . that such organization was a Communist organization." 64 Stat. 1007. In describing the purpose of this clause, Senator McCarran, the Act's sponsor, said: "Aliens who were innocent dupes when they joined a Communist-front organization, as distinguished from a Communist political organization [such as the Communist Party], would likewise not ipso facto be excluded or deported." 96 Cong. Rec. 14180. In view of this specific escape provision for members of other organizations, it seems clear that Congress did not exempt "innocent" members of the Communist Party.

While the legislative history of the 1950 Act is not illuminating on the scope of "member," considerable light was shed by authoritative comment in the debates on the statute which Congress enacted in 1951 to correct what it regarded as the unduly expanded interpretation by the Attorney General of "member" under the 1950 Act. 65

---

[3] Under § 7 of the Internal Security Act of 1950, "Communist-action" and "Communist-front" organizations are required to register as such with the Attorney General. Section 13 provides that where such an organization fails to register the Attorney General may institute proceedings requiring such registration.

Stat. 28. The amendatory statute dealt with certain specific situations which had been brought to the attention of Congress and provided that where aliens had joined a proscribed organization (1) when they were children, (2) by operation of law, or (3) to obtain the necessities of life, they were not to be deemed to have been "members." In explaining the measure, its sponsor, Senator McCarran, stated repeatedly and emphatically that "member" was intended to have the same meaning in the 1950 Act as had been given it by the courts and administrative agencies since 1918, 97 Cong. Rec. 2368–2374. See S. Rep. No. 111, 82d Cong., 1st Sess. 2; H. R. Rep. No. 118, 82d Cong., 1st Sess. 2. To illustrate what "member" did not cover he inserted in the Record a memorandum containing the following language quoted from *Colyer* v. *Skeffington,* 265 F. 17, 72: "Congress could not have intended to authorize the wholesale deportation of aliens who, accidentally, artificially, or unconsciously in appearance only, are found to be members of or affiliated with an organization of whose platform and purposes they have no real knowledge." 97 Cong. Rec. 2373.

This memorandum, as a weighty gloss on what Congress wrote, indicates that Congress did not provide that the three types of situations it enumerated in the 1951 corrective statute should be the only instances where membership is so nominal as to keep an alien out of the deportable class. For example, the circumstances under which the finding of membership was rejected in *Colyer* v. *Skeffington, supra,* would not have been covered by the specific language in the 1951 Act. In that case, the aliens passed "from one organization into another, supposing the change to be a mere change of name, and that by assenting to membership in the new organization they had not really changed their affiliations or political or economic activities." 265 F., at 72.

On the other hand, the repeated statements that "member" was to have the same meaning under the 1950 Act as previously, preclude an interpretation limited to those who were fully cognizant of the Party's advocacy of violence. For the judicial and administrative decisions prior to 1950 do not exempt aliens who joined an organization unaware of its program and purposes. See *Kjar* v. *Doak*, 61 F. 2d 566; *Greco* v. *Haff*, 63 F. 2d 863; *In the Matter of O—*, 3 I. & N. Dec. 736.

It must be concluded, therefore, that support, or even demonstrated knowledge, of the Communist Party's advocacy of violence was not intended to be a prerequisite to deportation. It is enough that the alien joined the Party, aware that he was joining an organization known as the Communist Party which operates as a distinct and active political organization, and that he did so of his own free will. A fair reading of the legislation requires that this scope be given to what Congress enacted in 1950, however severe the consequences and whatever view one may have of the wisdom of the means which Congress employed to meet its desired end.

On this basis, the Hearing Officer's finding that petitioner here was a "member" of the Communist Party must be sustained. Petitioner does not claim that he joined the Party "accidentally, artificially, or unconsciously in appearance only," to use the words in Senator McCarran's memorandum. The two points on which he bases his defense against the deportation order are, first, that he did not join the Party at all, and that if he did join, he was unaware of the Party's true purposes and program. The evidence which must have been believed and relied upon for the Hearing Officer's finding that petitioner was a "member" is that petitioner was asked to join the Party by a man he assumed to be an organizer, that he attended a number of meetings and that he did not apply for citizenship because he feared his Party

membership would become known to the authorities. In addition, on the basis of Mrs. Meza's testimony, the Hearing Officer was entitled to conclude that petitioner had been active in the Spanish Speaking Club, and, indeed, one of its officers. Certainly there was sufficient evidence to support a finding of membership. And even if petitioner was unaware of the Party's advocacy of violence, as he attempted to prove, the record does not show a relationship to the Party so nominal as not to make him a "member" within the terms of the Act.

This brings us to petitioner's constitutional attack on the statute. *Harisiades* v. *Shaughnessy,* 342 U. S. 580, sustained the constitutionality of the Alien Registration Act of 1940. 54 Stat. 670. That Act made membership in an organization which advocates the overthrow of the Government of the United States by force or violence a ground for deportation, notwithstanding that membership in such organization had terminated before enactment of the statute. Under the 1940 Act, it was necessary to prove in each case, where membership in the Communist Party was made the basis of deportation, that the Party did, in fact, advocate the violent overthrow of the Government. The Internal Security Act of 1950 dispensed with the need for such proof. On the basis of extensive investigation Congress made many findings, including that in § 2 (1) of the Act that the "Communist movement . . . is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship," and made present or former membership in the Communist Party, in and of itself, a ground for deportation. Certainly, we cannot say that this classification by Congress is so baseless as to be violative of due process and therefore beyond the power of Congress.

In this respect—the dispensation with proof of the character of the Communist Party—the present case goes beyond *Harisiades*. But insofar as petitioner's constitutional claim is based on his ignorance that the Party was committed to violence, the same issue was before the Court with respect to at least one of the aliens in *Harisiades*.

The power of Congress over the admission of aliens and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security. Nevertheless, considering what it means to deport an alien who legally became part of the American community, and the extent to which, since he is a "person," an alien has the same protection for his life, liberty and property under the Due Process Clause as is afforded to a citizen, deportation without permitting the alien to prove that he was unaware of the Communist Party's advocacy of violence strikes one with a sense of harsh incongruity. If due process bars Congress from enactments that shock the sense of fair play—which is the essence of due process—one is entitled to ask whether it is not beyond the power of Congress to deport an alien who was duped into joining the Communist Party, particularly when his conduct antedated the enactment of the legislation under which his deportation is sought. And this because deportation may, as this Court has said in *Ng Fung Ho* v. *White,* 259 U. S. 276, 284, deprive a man "of all that makes life worth living"; and, as it has said in *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, 10, "deportation is a drastic measure and at times the equivalent of banishment or exile."

In light of the expansion of the concept of substantive due process as a limitation upon all powers of Congress, even the war power, see *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 155, much could be said for the view, were we writing on a clean slate, that the Due Process

Clause qualifies the scope of political discretion heretofore recognized as belonging to Congress in regulating the entry and deportation of aliens. And since the intrinsic consequences of deportation are so close to punishment for crime, it might fairly be said also that the *ex post facto* Clause, even though applicable only to punitive legislation,[4] should be applied to deportation.

But the slate is not clean. As to the extent of the power of Congress under review, there is not merely "a page of history," *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349, but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. *The Japanese Immigrant Case,* 189 U. S. 86, 101; *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 49. But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government. And whatever might have been said at an earlier date for applying the *ex post facto* Clause, it has been the unbroken rule of this Court that it has no application to deportation.

We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who have been most zealous in protecting civil

---

[4] First in *Ogden* v. *Saunders,* 12 Wheat. 213, 271, and again in *Satterlee* v. *Matthewson,* 2 Pet. 380, 681 (appendix), a characteristically persuasive attack was made by Mr. Justice Johnson on the view that the *ex post facto* Clause applies only to prosecutions for crime. The Court, however, has undeviatingly enforced the contrary position, first expressed in *Calder* v. *Bull,* 3 Dall. 386. It would be an unjustifiable reversal to overturn a view of the Constitution so deeply rooted and so consistently adhered to.

liberties under the Constitution, and must therefore under our constitutional system recognize congressional power in dealing with aliens, on the basis of which we are unable to find the Act of 1950 unconstitutional. See *Bugajewitz* v. *Adams,* 228 U. S. 585, and *Ng Fung Ho* v. *White,* 259 U. S. 276, 280.

*Judgment affirmed.*

MR. JUSTICE REED concurs in the judgment of the Court and in the opinion as written, except as to the deductions drawn from Senator McCarran's citation of *Colyer* v. *Skeffington,* 265 F. 17, 72.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

Petitioner has lived in this country thirty-six years, having come here from Mexico in 1918 when only seven years of age. He has an American wife to whom he has been married for twenty years, four children all born here, and a stepson who served this country as a paratrooper. Since 1940 petitioner has been a laborer at the Van Camp Sea Food Company in San Diego, California. In 1944 petitioner became a member of the Communist Party. Deciding that he no longer wanted to belong to that party, he got out sometime around 1946 or 1947. As pointed out in the Court's opinion, during the period of his membership the Communist Party functioned "as a distinct and active political organization." See *Communist Party* v. *Peek,* 20 Cal. 2d 536, 127 P. 2d 889. Party candidates appeared on California election ballots, and no federal law then frowned on Communist Party political activities. Now in 1954, however, petitioner is to be deported from this country solely because of his past lawful membership in that party. And this is to be done without proof or finding that petitioner knew that the party had any evil purposes or that he agreed

with any such purposes that it might have had. On the contrary, there is strong evidence that he was a good, law-abiding man, a steady worker and a devoted husband and father loyal to this country and its form of government.

For joining a lawful political group years ago—an act which he had no possible reason to believe would subject him to the slightest penalty—petitioner now loses his job, his friends, his home, and maybe even his children, who must choose between their father and their native country. Perhaps a legislative act penalizing political activities legal when engaged in is not a bill of attainder. But see *United States* v. *Lovett,* 328 U. S. 303, 315–316. Conceivably an Act prescribing exile for prior innocent conduct does not violate the constitutional prohibition of *ex post facto* laws. Cf. *American Communications Assn.* v. *Douds,* 339 U. S. 382, 412–415. It may be possible that this deportation order for engaging in political activities does not violate the First Amendment's clear ban against abridgment of political speech and assembly. Maybe it is not even a denial of due process and equal protection of the laws. But see dissenting opinions in *Carlson* v. *Landon,* 342 U. S. 524, and *Harisiades* v. *Shaughnessy,* 342 U. S. 580. I am unwilling to say, however, that despite these constitutional safeguards this man may be driven from our land because he joined a political party that California and the Nation then recognized as perfectly legal.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

As MR. JUSTICE BLACK states in his dissent, the only charge against this alien is an act that was lawful when done. I agree that there is, therefore, no constitutional basis for deportation, if aliens, as well as citizens, are to be the beneficiaries of due process of law.

The case might, of course, be different if the past affiliation with Communism now seized upon as the basis for deportation had continued down to this date. But so far as this record shows, the alien Galvan quit the Communist Party at least six years ago. There is not a word in the present record to show that he continued his affiliations with it *sub rosa* or espoused its causes or joined in any of its activities since he ceased to be a member of it.

I cannot agree that because a man was once a Communist, he always must carry the curse. Experience teaches otherwise. It is common knowledge that though some of the leading Socialists of Asia once were Communists, they repudiated the Marxist creed when they experienced its ugly operations, and today are the most effective opponents the Communists know. So far as the present record shows, Galvan may be such a man. Or he may be merely one who transgressed and then returned to a more orthodox political faith. The record is wholly silent about Galvan's present political activities. Only one thing is clear: Galvan is not being punished for what he presently is, nor for an unlawful act, nor for espionage or conspiracy or intrigue against this country. He is being punished for what he once was, for a political faith he briefly expressed over six years ago and then rejected.

This action is hostile to our constitutional standards, as I pointed out in *Harisiades* v. *Shaughessy*, 342 U. S. 580, 598. Aliens who live here in peace, who do not abuse our hospitality, who are law-abiding members of our communities, have the right to due process of law. They too are "persons" within the meaning of the Fifth Amendment. They can be molested by the Government in times of peace only when their presence here is hostile to the safety or welfare of the Nation. If they are to be deported, it must be for what they are and do, not for what they once believed.