Matter of S——

In DEPORTATION Proceedings

A-1138079

*Decided by Board May 5, 1961*

**Deportability—Subversive organization—Membership in Socialist Workers Party ground for deportation under section 241(a)(6).**

(1) Evidence of record establishes that Socialist Workers Party between 1938 and at least February 1947 advocated overthrow of the Government of the United States by force or violence or other unconstitutional means.

(2) Alien who was member of Socialist Workers Party from 1938 to 1955, whose activities within the Party show that his membership was "meaningful," held deportable under section 241(a)(6) of the 1952 Act.

(3) That Socialist Workers Party is permitted to engage in political activity in State of Wisconsin which forbids such activity by any organization advocating forcible overthrow of the Government is not controlling in immigration proceeding where determination of deportability is based upon record created at the deportation hearing.

CHARGES:

Order: Act of 1952—Section 241(a)(6) [8 U.S.C. 1251(a)(6)]—After entry was a member of an organization that advocates or teaches the overthrow by force or violence or other unconstitutional means of the Government of the United States. (First charge)

Lodged: Act of 1952—Section 241(a)(6) [8 U.S.C. 1251(a)(6)]—After entry a member of an organization that advocates or teaches the economic, international, and governmental doctrines of world communism. (Second charge)

BEFORE THE BOARD

**DISCUSSION:** This is an appeal from the order of the special inquiry officer requiring respondent's deportation; respondent's application for suspension of deportation was denied on discretionary grounds. The appeal will be dismissed.

The facts have been set forth in great detail by the special inquiry officer and need not be repeated. Briefly, respondent is a 52-year-old single male, a native and citizen of Canada, who has been a resident of the United States since 1933; he was legally admitted for permanent residence on June 1, 1940, and has made brief visits to Canada since that time. He has admitted that he had been a member of the Socialist Workers Party from about 1938 to 1955.

The issue is whether the Socialist Workers Party (Party, hereafter) advocates the overthrow of this Government by force and violence or other unconstitutional means. We find it does.

The special inquiry officer sustained the first charge. He held that the Party advocated the overthrow of the Government of the United States by force or violence or other unconstitutional means from January 1938 to at least February 1947. The special inquiry officer sustained the second charge insofar as it related to the *advocacy* by the Party of the doctrines of world communism. Respondent denies that the Party comes within either of the two charges.

The genesis of the Party was in 1928 when the Communist Party of the United States expelled the supporters of Trotsky. After various attempts [1] to find a vehicle of expression and action, these supporters of Trotsky formed the Party in 1938.

The Party is committed to the theory of Marxism as laid down by Marx, Engels, Lenin, and Trotsky. In brief, it believes that the capitalist exploits the wage earner and uses the state as a means of repressing him; that capitalism must result in unemployment, war and other problems; and that these problems will become more intense with the passage of time. The Party believes that a scientific (Marxist) analysis of history reveals that capitalism will be unable to solve these problems but that they can be solved by socialism, the inevitable and only valid alternative. Socialism contemplates elimination of private ownership of the means of production, replacing it with state ownership and control. The Party finds that the obstacle to the flowering of socialism out of the "decay" of capitalism is the refusal of the capitalist class to give up its privileges; therefore, the Party urges the vanguard of the workers to build a strong revolutionary party to seize power, overthrow capitalism, and replace it with a dictatorship of the proletariat which will institute the forms of socialism. The Party believes that after the dictatorship has performed its function and all classes have been abolished, the dictatorship and the state itself will disappear.

The Party believes that socialism cannot exist in one country alone, but that it must be established throughout the world, and until 1940 was a member of the "Fourth International", an international organization composed of parties in other countries which follow the same beliefs. The Party quit the international organization in 1940, because such membership was made unlawful, but is still one in spirit with it.

---

[1] In 1928, the Trotskyites formed the Communist League of America which merged in 1934 with the American Workers Party and became the Workers Party of the United States; in 1936, this Party joined the left wing of the Socialist Party which expelled it late in 1937; the Socialist Workers Party was then formed.

While the Party follows the teachings of Marx, Engels, Lenin and Trotsky, it is opposed to the Soviet Government insofar as the Communist Party of the Soviet Union exercises dictatorial control over the workers of the Soviet Union instead of permitting the workers themselves to exercise control, and insofar as the Communist Party of the U.S.S.R. believes that socialism can exist in one country.

We may now discuss the record as to whether the Party advocates force or violence or other unconstitutional means to institute its program of socialism.

Respondent's case is that the Party seeks to achieve its aims by convincing the majority of the need for change. He holds that the Party does not advocate the use of force, but expects to use force because the scientific analysis of history has revealed that as the proletariat become a real threat to the privileges of the government, the government will use force to prevent the proletariat from obtaining a legal majority. Also, if the government has been dispossessed, it will use force to regain its privileges.[2] It seems to us that this very attempt at justification for the use of force is an admission that the Party advocates the use of force to overthrow this Government. The change of government by peaceful and legal means is not barred by the Constitution. Change may be based upon the will of the people, expressed in majorities, under the proper forms of law, at the ballot box (Article IV, section 4, Constitution of the United States; see *Hopkins* v. *Duluth*, 83 N.W. 536). The Party's certitude that force will nevertheless be used against it condemns it to look upon parliamentary means as futile and leaves it dependent upon a program of force and violence. Refusal by the Party to confine itself to the ballot and to the time it achieves a formal majority envisions unconstitutional means.

However, we need not rest upon the self-serving statements of the Party as to the use of force. We will examine other statements which reveal that force is a positive policy of the Party. Before we do this, we must determine what effect to give the statements on this issue in Party literature. This Party literature consists not only of the official program of the Party, the "Declaration of Principles" and the program of the international organization to which it belonged, but articles, papers, books, and magazines published by the Party. The "Declaration of Principles" was the Party's plat-

---

[2] We understand that the Party rejects violence by individuals, or partial uprisings of small groups of armed people (until such time as the Party engages in a civil war) and that it realizes success can attend its efforts only if it obtains a substantial number of organized disciplined people to do its will. We also understand that some members did not personally advocate violence (although the Party taught that it was inevitable and that power might be taken by other than democratic means.

form and thus can be relied upon as representing the **Party's view;** however, a question exists as to whether the other matters can be relied upon as stating the Party view or whether they presented points of view which, although of interest to members, were not necessarily the Party's.

We find that the Party view is stated in Party publications. The theory that official Party publications were instruments of discussion was specifically rejected by the Party. Trotsky, the leading theoretician of the Party, advised the majority of the National Committee of the Party on this very issue in the following terms:

*The New International* [Party monthly, p. 24] and *Socialist Appeal* [official paper, exh. 11, p. 17] are not instruments of the discussion under the control of a special discussion committee, but rather instruments of the party and its National Committee. In the discussion bulletin the opposition can ask for equal rights with the majority, but the official party publications have the duty to defend the point of view of the party and the Fourth International until they are changed. A discussion on the pages of the official party publications can be conducted only within the limits established by the majority of the National Committee. It is so self-evident that arguments are not necessary. (exh. 13, p. 65, Dec. 26, 1939)

\*      \*      \*      \*      \*      \*

Second, if the National Committee finds it necessary to devote one issue of the New International to the discussion (I don't propose it now), it should be done in such a way that the reader sees where the party position is and where the attempt at revision, and that the last word remain with the majority and not with the opposition. (exh. 13, pp. 65-66, Dec. 26, 1939)

The Party followed the proposed policy (exh. 13, p. 65, footnote).

Our belief that Party policy could have been learned from official publications of the Party is supported by the fact that members of the Party did learn in this way. Two witnesses presented by respondent revealed under questioning by counsel for respondent that their familiarity with the political philosophy of the Party was obtained through reading the publications of the Party; both these witnesses mentioned the weekly and monthly journal published by the Party as source material, and one of the witnesses added the "available writings of Leon Trotsky and James P. Cannon." [3] Respondent stated that "The Militant," a Party weekly, expressed the views of the Party although some articles may not have represented the Party view. Cannon also stated that articles on current events in Party publications did not necessarily reflect the view of the Party but indicated that there was less leeway permitted as to whether the revolution would be accompanied by force for on this matter there was greater agreement. Moreover, Cannon stated that the Party press was used by the Party to secure a correct interpre-

---

[3] One of the founders of the Trotsky movement in the United States, titular and ideological head of the Party at least during the period of respondent's membership at Newark, New Jersey, from 1939-1947.

tation of Party policy; it would seem to follow that the press did, therefore, present the Party view. A Government witness testified that pamphlets published by the Party represented the views of the Party except that a minority view could sometimes be published. We note that apparently neither respondent nor the witnesses had any problem in determining whether or not the articles they read represented the Party view. Moreover, our examination of the publications in the record reveals that when something is mentioned with which the Party does not agree, it is mentioned in a manner which reveals the superiority of the Party view, and that on matters obviously contrary to the Party policy, which are printed in the official publications, there is a careful analysis showing the "correctness" and superiority of the Party line. We therefore, feel that it is proper to rely upon publications of the Party press as authoritative expositions of the Party line (*Matter of H—,*) 3—411, 421).

The literature of the Party contains statements contrary to the present protestations that force would not be used to achieve the program of the Party until it met armed resistance. The Declaration of Principles and the Constitution of Party, adopted at its Foundation Convention in January 1938, in effect until December 1940, and regarded as the "letter of the law" for the Party, states that it is "an illusion" to believe "that in such a country as the United States we live in a free, democratic society in which fundamental economic change can be effected by persuasion, by education, by legal and purely parliamentary methods." The document continues that "the possibilities for purely legal and constitutional change are therefore limited to those which fall within the framework of capitalist property and social relations." The same document contains the following statement, "While relying primarily on mass actions, propaganda and agitation as the means for furthering its revolutionary aim, the Party will also participate in electoral campaigns, though at all times contending against the fatal illusion that the masses can accomplish their emancipation through the ballot box." These expressions are written for mass appeal; they are not qualified where they appear. They should be taken for the meaning they openly state. Such expressions by themselves and especially when considered with the Party belief that the task laid out by history requires the Party to replace this Government with a dictatorship of the proletariat, and the Party's renouncement of the role of a critic or passive observer—these matters—coupled with the failure to clearly reject the use of force, are strongly indicative that the means of conviction left—force—will be used as a positive weapon in overthrowing this Government.

Party belief that a peaceful democratic transformation of society

256

is preferable but not probable is persistent, widespread, and is obviously the result of much thought. In 1942, Cannon stated in a careful analysis that while socialism preferred a peaceful transition, it rejected that possibility for the United States. An article in 1947 in the "Fourth International," the official monthly publication of the Party, indicates that force is the primary weapon. This article states that the hypothesis that power can be won through the parliamentary road "is not theoretically excluded in certain exceptional circumstances," and that "What is important is not *how* a 'workers' government is formed, but the *kind of action* (purely parliamentary or revolutionary) which it undertakes afterwards and the *program* it tries to carry out" (emphasis in original). Cannon testified late in 1941 that the Party did not expect to gain power through elections but nevertheless it expected to take power. In the spring of 1942, he characterized a "parliamentary project" to sell the Trotskyite program by advocating that it be made an amendment to the constitution as "capitulatory, a philistine program of the crudest kind." The editor of the Party monthly, in an article devoted to an attack of Party philosophical beliefs, makes the matter-of-fact statement that one of the planks of the "basic program" of the Party is the "rejection of parliamentary road, and the article reveals that when he speaks of the revolutionary road it is in contrast to the parliamentary road (1940). It is interesting that the editor's statements are made in the bland assumption that concerning these matters a common understanding exists which makes discussion unnecessary.

Our conclusion that violence is a positive instrument for achieving the Party's program takes into consideration the self-serving statements that the Party was working to convince the "majority" of the need for its program. Talk of "majority" is misleading without the realization that to the Party the term is not a number greater than half, but rather is a highly subjective term describing a mystical moment which occurs when the Party leaders declare that the Party is representative of the will of the classes that count —workers and poor farmers. The subjective nature of this term is readily apparent from statements of James P. Cannon, leader and spokesman of the Party, in answer to a critic. At a federal trial of the Party leadership, Cannon had portrayed the Party as interested in winning the majority of the people of the United States to its program by education and propaganda. The critic was against Cannon's failure to have boldly affirmed the Party's belief in force, in action to "conquer the majority of the exploited and educate them for the taking of power." To this criticism of submission to the majority, Cannon replied that the majority support with which he is concerned was "the real majority whose sentiments

257

are ascertainable in various ways besides the ballot box of the bourgeoise state." Using the Russian Revolution as an example, Cannon pointed with approval to Lenin's urging that an insurrection be started against the Russian Government although some members of his Party did not believe that the Party had a majority. With obvious approval, Cannon quotes the statement of Lenin that (to proceed with the insurrection) there need be no "guarantee in advance that the Bolshevik Party throughout the country has received exactly one half the number of votes plus one." Commenting on the fact that Lenin did not worry about a formal majority, Cannon concludes that "no revolution ever awaits for *this*"; it is enough to have a "*real* majority" (emphasis in original).

Add to the Party's subjective definition of "majority" the fact that the Party is convinced that ours is a Government of the minority repressing the majority and that the everyday existence of our Government is an act of violence against the majority, what does the Party give itself but a blank check on the use of force?

In view of the inconsistency between the explanation by respondent and Party leaders as to the use of force, and to the written statements indicating that force must be used as a positive means, it is pertinent to consider the Marxist attitude to truth. *The History of American Trotskyism* by Cannon (Pioneer Publishers, New York, 1944, exh. 14) contains a course of lectures on the Party and its predecessors. Cannon, a defender of "Bolshevik morality" (exh. 14, p. 254), gave his listeners the following advice (speaking on the desirability of operating as an open political organization rather than an underground one):

. . . a genuine Bolshevik, even in times of sharpest persecution, tries always to grasp and utilize every possibility to function in the open. If he can't say everything he wants to say openly, he will say as much as he can—and supplement legal propaganda by other methods. (pp. 11–12)

Cannon told his listeners that although he supported Trotsky, he did not speak up in defense of Trotsky at a Communist Congress in which the majority opposed Trotsky because,

Frankness among friends is a virtue; in dealing with unscrupulous enemies it is the attribute of a fool. (exh. 14, p. 50)

The lectures show Cannon stating with pride that in factional disputes with fellow revolutionaries he concealed the truth and misled his comrades until he deemed the time right for the truth; he reveals proudly how in a factional dispute, after his faction had promised to give up its own press, it violated its promise as soon as possible; and he relates that subsequently when it was forced to give up its paper, it proceeded to violate the ban "legally." The importance of this is that Cannon does not reflect his own view but presents an official view. His lectures, filled with a history of de-

ception and violation of promises under a guise of legality, are recommended in the introduction as filling a need for "advanced workers * * * willing to" learn, and the book is characterized as one of the "handbooks of Party builders and organizers in the United States"; it is also stated that the book offers ample reward to those who bring "a receptive mind and a willingness to assimilate * * * the lessons" (Introduction, exh. 14). The recommendation is made by Joseph Hansen, who was apparently the author of a book on what the Party stood for and who in 1951 was business manager for Party papers and spokesman for the Party (exh. 6, "The Militant," March 26, 1951, cols. 1 and 6). We note also that Cannon's book was still offered for sale by the Party as late as 1951 (exh. 6, "The Militant," December 10, 1951, cols. 1 and 2).

In 1942, Cannon pointed out in an official publication that for the Party the "moral" aspect of the use of force (sabotage) does not exist but that the problem is one to be decided only by political consideration; and, he emphasized the importance of cloaking insurrection as a "defensive" action. That deception is an inherent weapon for the Party, and not merely accidental to a party official, would appear from the fact that the program of the international organization of the Trotskyist (Fourth International) rejects traditional standards of right and wrong. The program states:

In a society based upon exploitation, the highest moral is that of the social revolution. All methods are good which raise the class consicousness of the workers, their trust in their own forces; their readiness for self-sacrifice in the struggle. The impermissible methods are those which implant fear and submissiveness in the oppressed before their oppressors, which crush the spirit of protest and indignation or substitute for the will of the masses the will of the leaders; for conviction—compulsion; for an analysis of reality—demagogy and frame-up. That is why Social Democracy, prostituting Marxism, and Stalinism—the antithesis of Bolshevism—are both moral enemies of the proletarian revolution.

(The Party adopted the program of the Fourth International (exh. 14, pp. 252–253; see also p. 99; exh. 11, p. 42).)

In considering respondent's own credibility, it must be noted, in addition to his self-interest, that on two occasions in about 1948 when respondent was questioned by Service officials in connection with organizational memberships he did not reveal that he had been a member of the Socialist Workers Party, although on one occasion he had been specifically asked concerning such membership. His reason for the concealments is that he did not consider questions on his political beliefs as within the province of a Government bureau. There is no showing that he revealed this reason on the first occasion, and whether or not he revealed it on the second is not clear. We note also that respondent's visa application executed in 1940 fails to show membership in the Party, although information as to membership in subversive organizations is called for.

259

This Trotskyite attitude toward "truth" and "legality" permits a proper understanding of Cannon's answer to the selfsame critic, previously mentioned, who also accused Cannon of using subterfuge when on trial because he told the court that the Party did not advocate the use of violence except in answer to aggression from the minority. Cannon's answer to the critic was that he had not abandoned the principles of the Party but had engaged in a maneuver made necessary by the fact that the American worker was not ready for a call to violence at the time and that the talk about violence would not serve the purpose of the revolutionary vanguard at a time when it was gathering strength and was threatened with illegality; Cannon also pointed out that violence should be kept in the background to be brought out when it would prove effective.

The Party's attitude to truth must also be considered when evaluating their explanation which attempts to give specialized and uncommon meanings to words like "majority," "revolutionary," etc. As to "revolutionary," use of which the Party attempts to explain as expressing the change from one social system to one totally different, we would point out that in the Party use the word seems to have had its regular meaning of violent change. For example, the Socialist Party of the United States also believes in a change from one social system to another. This fact alone did not make it a revolutionary party in Trotskyite eyes. It was only the entry of the Trotskyites into the Socialist Party which gave it a "revolutionary coloration."

In summary then, we find, although the evidence is conflicting, that violence is a tool in the Party's program of overthrowing this Government, and that its use awaits not the moment when those who oppose the Party offer armed resistance, but rather that time when the leaders feel is ripe for its use. Our conclusion is based on the written statements of the Party rejecting the parliamentary road; the dogma which guarantees to it that capitalism is outmoded and that socialism is the only legitimate successor; its belief that it is acting as an instrument for the good of all humanity in bringing about socialism; the belief that all means are proper which bring about such a goal; the cherishing of the example of the Russian Revolution which overthrew the lawful government; the dogmatic assumption that force will be used against it and the necessity of preparing for this eventuality; the rejection of the meaning commonly assigned to "majority" and the failure to reject force as a positive instrument even after 18 of its leaders were convicted for conspiring to advocate the use of force. These facts require the conclusion that the Party advocates the overthrow of the Government of the United States by force or violence.

The Party also advocates the use of other unconstitutional means.

Its rejection of the traditional method of determining what is a "majority" is the advocacy of an unconstitutional means. It advocates the establishment of "Soviets" as councils representing workers, soldiers and farmers based on occupational units to represent the will of the people as opposed to the organs provided for by the Constitution for this purpose—organs based on majorities organized territorially; this constitutes an advocacy of unconstitutional means. It advocates expropriation, the taking of property without due process and compensation; this likewise is the advocacy of an unconstitutional means.

We come now to respondent's participation in the Party. The special inquiry officer has used the years from at least 1938 to 1947 as the period during which the Party advocated the use of force and violence in overthrowing the Government of the United States. The year 1947 was selected because the record, in his opinion, did not establish that the documents containing the aims of the Party were distributed after 1947. We believe that it would not be improper to assume that the proscribed teachings continued in the absence of an express rejection of the use of unconstitutional methods (*Kjar v. Doak*, 61 F.2d 566 (C.C.A. 7, 1932)), but we will deal only with the period from 1938 to 1947 since if respondent had been a member only during such period or any part of it, his membership would nevertheless make him deportable (*Galvan v. Press*, 347 U.S. 522; *Harisiades v. Shaughnessy*, 342 U.S. 580; *Carlson v. Landon*, 342 U.S. 524).

Respondent was a member for the entire period in question or most of it. He had been a member from the start of the Party itself, or shortly thereafter. He did not come to the Party as a stranger to the radical movement; he had been a member of the Socialist Party from 1936 until he entered the Party. His membership in the Socialist Party existed at a time when there was considerable exploration of the means of achieving socialism. Respondent left the Socialist Party to join one which was established by the "Convention of Revolutionary Socialists" and which called upon all revolutionary militants to join them in building the Party into a "mass revolutionary party." The respondent entered the Party with knowledge of its literature and had read its literature during the period in question. He knew that the Party called for a change in this country's form of government. (Respondent had three years at the University of Toronto.) He was familiar, at least in part, with the "Declaration of Principles and the Constitution of the Socialist Worker's Party," "The Founding Conference of the Fourth International, *etc.*," "Socialism on Trial," "Defense Policy in the Minneapolis Trial," "In Defense of Marxism," "The History of American Trotskyism," "The Communist Manifesto,"

261

and, in part or whole, with many other booklets on socialism. The Party used classes, meetings, and its press to secure a correct interpretation of Party policy. Respondent, in addition to being a reader of the press, attended classes and meetings with regularity from about once a week to once a month. On two occasions he addressed the group.

A member of the Party was obliged to accept the policy of the Party, and upon joining was required to certify that he accepted the Declaration of Principles and Constitution and agreed to abide by the discipline of the Party (exh. 8, Article IV, sections 1, 2; Article IX, pp. 29–30). The respondent's activities are ample proof that he accepted the obligations of his membership. He was an active supporter and worker for the Party. He paid his dues regularly and made voluntary contributions in considerable amounts from time to time. He sold publications of the Party, and attempted to recruit a member on at least one occasion. He served as the treasurer of his branch and was on the Educational Committee. He was also charged with physical maintenance of the office. He attended conventions of the Party, spending several days there and attending meetings although he was not a delegate.

The length of respondent's membership, its continuance after 18 leaders of the Party had been convicted for conspiring to overthrow the Government by force and violence (1941), his educational background, his service to the Party, his familiarity with the literature of the Party, his attendance at classes and meetings, and his activity establish that the membership was meaningful; and these factors take his case out of *Rowoldt v. Perfetto* (335 U.S. 115) which counsel believes is applicable (*Niukkanen v. McAlexander*, 362 U.S. 390; *Galvan v. Press, supra*).[4]

Counsel contends that there is no evidence that respondent personally advocated proscribed doctrines. It is not our understanding that such advocacy need be established. However, if personal advocacy need be shown, it is found in this record which reveals activity, knowledge of Party literature, membership for the purpose of advancing the Party program of political change, and continuance of membership after leaders of the Party were convicted for having conspired to advocate the overthrow of the Government by force (*Dunne v. United States*, 138 F.2d 137, cert. den. 320 U.S.

---

[4] The Service representative argues that *Rowoldt* does not apply where the charge is based on the Immigration and Nationality Act. We find it unnecessary to consider the argument at this time (see, *Matter of C—*, 6—50, 52; furthermore, the same argument is made in the brief submitted by the Government in *Gastelum-Quinones v. Rogers*, 286 F.2d 824 (C.A. D.C., 1960), cert. den. 365 U.S. 871, where in a similar situation the court applied *Rowoldt* and found the alien deportable, but did not discuss this contention.

790; *Galvan* v. *Press, supra*, p. 528, citing *Kjar* v. *Doak*, 61 F.2d 566; *Greco* v. *Haff*, 63 F.2d 863; *Matter of O—*, 3—736).

Counsel believes that since the Party is permitted to engage in political activity in the State of Wisconsin which forbids political activity by an organization which advocates the overthrow of Government by force and violence, it is improper to find that the Party is a proscribed organization. The fact that the State of Wisconsin permits the existence of the Party has been taken into consideration. It is a factor, but not a controlling one in this federal matter. It is no more controlling than is the fact that the leaders of the Party were found to have conspired to advocate the overthrow of the Government by force. The decision in the case before us must be made upon the record before us. The record establishes deportability on the charge discussed.

Since we have found respondent deportable on the first charge, we find it unnecessary to consider the second charge. Deportation will be ordered only on the first charge.

We have not discussed the testimony of the Government witnesses or the witnesses of the respondent in detail. The testimony of the Government witnesses is considered merely corroboratory of the documentary evidence. Counsel's contention that the Government witnesses were members only at the Party's beginning, when it was more radical, is not relevant. The record fails to establish any real break with the Party's revolutionary past. Furthermore, proof that the organization had changed would not relieve the alien from liability to deportation (*Galvan* v. *Press, supra*). The testimony of respondent and his witnesses, with the exception of J—, is touched with self-interest. J—, who was offered as an impartial expert by respondent, showed confusion as to whether or not he was a member of the Socialist Workers Party. Membership, if it existed, could have been only for a short period of either some months or perhaps most of 1938. J— exhibited a serious confusion between the Party and the Socialist Party (a Marxist Party which does not have a "revolutionary coloration"). In giving an example of the reliance by the Party on the electoral process, J— mentioned an election campaign which sought to elect Norman Thomas. Norman Thomas was the leader of the conservative section of the Socialist Party and was held in low esteem by the Party. Moreover, J— revealed a lack of definite knowledge about as important a matter as the Party's affiliation with the Fourth International. J—'s testimony that the Party placed its reliance upon parliamentary means is contradicted by reasonable, substantial and probative evidence.

We find no prejudicial error committed by the special inquiry officer in the conduct of the case. In addition to the oral argu-

263

ments, the briefs of counsel and the examining officer have been considered.

Respondent's application for suspension of deportation was denied by the special inquiry officer on the ground that deportation would not result in exceptional and extremely unusual hardship. Respondent is single; his nearest family in the United States consists of a sister; he has no dependent family ties in the United States; he is a skilled cabinet maker; he has assets in excess of $9,000 and there appears to be no reason why he could not obtain employment in Canada. We believe the special inquiry officer ruled properly in this matter. We would also add the fact that the respondent's continued membership until 1955 in an organization which for a long period of time advocated the overthrow of the Government by force and violence and which as far as this record shows has never repudiated such a policy is a further factor. In this regard, we would point out that respondent's membership continued in the Party although in 1941 eighteen of its officers were convicted in a federal court for conspiring to advocate the overthrow of Government by force and violence. (The Service representative argued that respondent has failed to establish that he would be ineligible for the issuance of a visa if he applied for one in Canada and would, therefore, as a native of a contiguous territory be ineligible for suspension of deportation (section 244(a)). We need not rule on this.)

**ORDER:** It is ordered that the appeal be dismissed but that respondent be deported from the United States in a manner provided by law solely on the following charge:

Section 241(a)(6), Immigration and Nationality Act (8 U.S.C. 1251(a)(6)) —After entry was a member of an organization that advocates or teaches the overthrow by force, or violence, or other unconstitutional means, of the Government of the United States.