SHEPHERD, J.
This is another in a series of cases in which an unaccompanied minor, who illegally crossed the border of the United States, seeks ’ an order finding him or her dependent under Chapter 39 of the Florida Statutes, for the sole purpose of helping the child obtain legal residency in the United States. We previously have affirmed trial court denials of dependency in six similar cases. See In the Interest of F.J.G.M., — So.Sd —, 40 Fla. L. Weekly D1908 (Fla. 3d DCA Aug. 12, 2015); D.A.O.L. v. Dep’t of Children & Families, 170 So.3d 927 (Fla. 3d DCA 2015); In re J.A.T.e., 170 So.3d 931 (Fla. 3d DCA 2015); M.J.M.L. v. Dep’t of Children & Family Servs., 170 So.3d 931, 932 (Fla. 3d DCA 2015); In re B.Y.G.M., 176 So.3d 290 (Fla. 3d DCA 2015); In re K.B.L.V., 176 So.3d 297 (Fla. 3d DCA 2015). We now add one more to the list.
Procedural and Factual Background
Like the petitioners in the prior cases, B.R.C.M. was born in Central America, in this case, Guatemala. B.R.C.M. was abandoned by his father at birth and his mother when he was four-years old. His grandmother then took him into her house and cared for him until he turned age fourteen, when he and some friends left Guatemala, travelled through Mexico, and *751 entered the United States illegally at Hi-dalgo, Texas. B.R.C.M.’s stated reasons for. taking this action, according to the sworn petition filed in this case, are that his grandmother had arrived at an age where she no longer was able, to care' for him, he did not have any other-family members in Guatemala, and he feared he would be assaulted and forced to join a local gang. Upon crossing .the border, B.R.C.M. turned himself in to the border patrol, and, before the month was out, the Office of Refugee Resettlement of the United States Department of Health & Human Services placed him with his godmother in Miami. , Within days of his arrival in Miami, B.R.C.M. heard from and received a visit from his father, allegedly for the first time since birth. Although B.R.C.M.’s father has not provided any food or money for basic necessities,[1] he has maintained telephone contact with B.R.C.M. since that time.
B.R.C.M.’s sole purpose for filing the Petition for Dependency in this case is to facilitate an application for Special Juvenile Immigrant Status and seek lawful permanent residency status in the United States. See 8 U.S.C. § 1101(a)(27)(J). As with every case of this type that has come before this court, B.R.C.M- does not seek any services from the Florida Department of Children and Families. His godmother is providing his every need.
Analysis
The case before us is distinguishable from all the others that have come before this court in only one respect — the caretaker in this case is neither a parent nor a legal guardian, but instead a godmother. We nevertheless affirm the dismissal of this case by the trial court. As counsel for the Department, whom the court ordered to attend the oral argument in this matter,[2] conceded, the purpose of the dependency provisions of Chapter 39 of the Florida Statutes, §§ 39.501-39.510, Fla. Stat. (2015), is not to facilitate the pursuit of Special Juvenile Immigrant Status, but rather to provide services to children who are truly abandoned, abused or neglected:
-. Court: The purpose of this statute is not - what it is being used for in this case, the purpose of this statute, according to section 39.001 is “to provide for the care, safety, and protection- of chil- - dren,” correct?
DCF Counsel: Correct.
Court: So this is not the purpose of the ■' statute, correct? ' "
DCF Counsel: Correct, unless they are truly abandoned, abused or neglected.
(Emphasis added.). It is plain on the face of the petition that B.R.C.M. is not “truly” abandoned, abused or-neglected within the *752 meaning of Chapter 39 of the Florida Statutes.
As to abandonment, section 39.01 of the Florida Statutes states:
(1) “Abandoned” or “abandonment” means a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the caregiver, while being able, has made no significant contribution to the child’s care and maintenance or has failed to establish or maintain a substantial and positive relationship with the child, or both. For purposes of this subsection, “establish or maintain a substantial and positive relationship” includes, but is not limited to, frequent and regular contact with the child through frequent and regular visitation or frequent and regular communication to or with the child, and the exercise of parental rights and responsibilities. Marginal efforts and incidental or token visits or communications are not sufficient to establish or maintain a substantial and positive relationship with a child.
“Caregiver” is defined to mean “the parent, legal custodian, permanent guardian, adult household member, or other person responsible for a child’s welfare as defined in subsection (47).” See § 39.01(10), Fla. Stat. (Emphasis added.). Subsection 47 provides in pertinent part:
(47) “Other person- responsible for a child’s welfare” includes the child’s legal guardian or foster parent; an employee of any school, public or private child day care center, residential home, institution, facility, or agency; - a law enforcement officer employed in any facility, service, or program for children that is operated or contracted by the Department of Juvenile Justice; or any other person legally responsible' for the child’s welfare in a residential setting; and ■ also includes an adult sitter or relative entrusted with a child’s care.
(Emphasis added.) Although a “godmother” is.not expressly included in the enumeration of other persons responsible for a child’s welfare in- subsection 47, the definition by its terms is not exclusive. See Include, Black’s Law Dictionary (10th ed.2014) (“include vb. (15c) To contain as a part-of something. • The participle including typically indicates a partial list .... ”); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 (2012) ([T]he word include does not ordinarily introduce an exhaustive list — ). Especially considering the purpose of the statute is to assist families and children who are truly needy, we decline to accept the crabbed interpretation of “other persons” sought by the petitioner in this case.
On this measure, the case before us is indistinguishable from In re B.Y.G.M., 176 So.3d at 290. B.Y.G.M. was a native of El Salvador. His father abandoned him when he was eight-months old, and his mother left for the United States when B.Y.G.M. was three-years old. After he illegally entered the United States, the Office of Refugee Resettlement placed him with his mother in the United States. Just as with B.R.C.M., B.Y.G.M.’s every need was met at the time he filed his petition for dependency. In B.Y.G.M., we concluded that the “father’s abandonment was .... too remote to serve as the basis for dependency and did not cause B.Y.G.M. any harm.” Id. at 293 (citing B.C. v. Dep’t of Children & Families, 846 So.2d 1273, 1274 (Fla. 4th DCA 2003) (stating. that “[i]n order to support an adjudication of dependency, the parents’ harmful behavior must be a present threat .to the child”)). The same conclusion obtains, a fortiori, in this case.
B,R.C.M.’s claim of .abuse under Chapter 39 fails for the same reason. Section 39.01(2) of the Florida Statutes defines “Abuse” as follows:
*753 (2) “Abuse” means any willful act or threatened act that results in any physical,-mental, or sexual abuse, injury, or harm that causes or is likely to cause the child’s physical, mental, ■ or emotional health to be significantly impaired. Abuse of a child includes acts or omissions. Corporal discipline of a child by a parent or legal custodian for disciplinary purposes does not in itself constitute abuse when it does not result in harm to the child.
There is no allegation in this case that anyone has ever laid a hand or threatened to lay a hand on B.R.C.M., even vyhile he resided in his home country, Guatemala. His problem is one typical of all minors who are not safe outside their homes because of a government that is unable to provide them, their family members and neighbors a safe environment in which to go about their daily lives. Sadly, what exists in Guatemala is what exists in the majority of countries of the world today-lawless nations and societies which- do not provide or do not choose to- provide freedom, safety and security to their citizens. Whether or not to accommodate individuals of any age into this country on the basis of the conditions of the country in which they were born or reside is not for us to decide. It is a matter of federal policy entrusted to the United States Congress. See, e.g., Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (“Policies pertaining to the entry of aliens and their right to remain here are ... entrusted exclusively to Congress.”).
Finally, there is no cognizable claim in this case for an adjudication of dependency based upon “neglect.” Section 39.01(44) of Florida’s dependency law defines “neglect” as follows:
(44) “Neglect” occurs when- a child is deprived of, or is allowed to be deprived of, necéssary food, clothing, shelter, or medical treatment or a child is permitted to live in an environment when such deprivation or environment causes the child’s physical, mental, or emotional health to-be significantly.impaired or to be in danger of being significantly impaired. The foregoing circumstances shall not be considered neglect if caused primarily by financial inability unless actual services .for relief have been offered to and rejected by such person.
B.R.C.M. does not' seriously contend that his grandmother neglected him during the ten years he lived in her home in Guatemala. Rather, the gravamen of his petition' is that it was his parents who “neglected” him by leaving him behind or not making any arrángements for someone to take care of him. ’ For exampié, paragraph 23 of the petition allegés:
[B.R.C.M.] is a neglected child because his parents failed to provide for him or arrange for the provision of his basic necessities. [B.R.C.M.] ’s parents “permitted [B.R.C.M.] to live in an environment” in which his health.was “in danger of being significantly .impaired.” [B.R.C.M.] ’s parents made.no arrangements for. someone to take care of [B.R.C.M.], nor , did ;. they send [B.R.C.M.] any money to provide himself with food and clothing.”
In making this allegation, the petitioner conflates “neglect” with' “abandonment.” The harm alleged here is a consequence of B.R.C.M.’s abandonment. There is no claim that'his mother, the only parent he had during the first1 four years of his life, “neglected” him during those early’ years, or that B.R.C.M.’s grandmother did-not do all she could possibly do in her circumstance during the ten years B.R.C.M. lived with her. Rather, B.R.C.M. avers only that after ten years living with his grandmother, the grandmother—now having reached the age of seventy-five—could no longer take adequate care of him; Although this claim, like every other one *754 made by the petitioner, is too remote to constitute “neglect” under section 39.01(44) of the Florida Statutes, it also fails on the merits of the allegations of the petition.
■ The petitioner in this and all similar cases have urged that a literal interpretation of Chapter 39 affords them the blessing of a dependency adjudication. For example, one of the specific allegations in this case is that, without more, B.R.C.M. is entitled to a dependency adjudication because one of the definitions of a “dependent child” in section 39.01 of the Florida Statutes is “[a child] whom the court finds ... (e) [t]o have no parent or legal custodians capable of providing supervision or care.”[3] A godmother is neither a parent nor legal custodian under the statute.[4] However, it is apodictic among the canons of judicial interpretation that judicial interpreters should consider the entire text of a statute, including its structure and the physical and logical relation of its many parts, when applying the language of the statute to a set of facts. See, e.g., Scalia & Garner, supra at 167 (“Perhaps no interpretative fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view' of its structure and of the physical and logical relation of its many parts.”). Counsel for B.R.C.M. ignores this canon of construction, instead engaging in a process of etymological dissection in which he seeks to separate words and phrases and then apply to each to reach his desired result. This interpretive form is contrary to acceptable revelatory practice in the field of statutory construction. See 2A Sutherland Statutory Construction § 46:5 (7th ed.) (“The meaning of a statute is determined, not from special words in a single sentence or section, but from the statute as a whole and viewing legislation in light of its general purpose.”); see also Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 415, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005) (“Statutory language has meaning only in context.”); QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass’n, Inc., 94 So.3d 541, 551 (Fla.2012) (“In determining the meaning of the language used, the court must look not only to the words themselves but also to ‘the context in which the language lies. ”) (quoting Miele v. Prudential-Bache Sec., Inc., 656 So.2d 470, 472 (Fla.1995)). We conclude, just as we did recently in In re K.B.L.V.: “The purpose of the dependency laws of this state is to. protect and serve children and families in need, not those with a different agenda.” 176 So.3d 297, 301 (Fla. 3d DCA 2015) (J. Shepherd, specially concurring).
For this reason, we affirm the order under review.
Affirmed.
LOGUE, J., concur.

. Nor has B.R.C.M.’s pro bono counsel sought an order requiring B.R.C.M.’s father to contribute to his support. .

. Counsel for the Department admitted at oral argument in this case that section 39.051(51) of the Florida Statutes makes it a party to every private dependency petition filed in the circuit court. Counsel also announced that as a result of the issuance of our opinion in B.Y.G.M. on July 15, 2015, the Department had abandoned its policy of not participating in these cases. Recent filings in this court indicate that the Department has resumed its practice of opposing these petitions. See Appellee's Answer Brief at 5-6, W.A.Z.R. v. Dep’t of Children & Families, No. 15-1577 (Fla. 3 DCA Dec. 2, 2015) (explaining that Chapter 39 "focuses on the lack of care a child is experiencing because the person responsible for the child — a parent or caregiver — has failed .in their parental duties toward the child” as distinguished from some remote harm) (emphasis added); Appellee's Answer Brief at 4, S.F.A.C. v. Dep’t of Children & Families, No. 15-2120 (Fla. 3DCA Nov. 16, 2015) (denying petition for dependency where petitioner's, proffered evidence is insufficient to support an adjudication of dependency).

. The other claims in this case are that B.R.C.M. is dependent on the court pursuant to section 39.01(15)(a) and (f).

. B.R.C.M.'s godmother is an "Office of Refugee Resettlement approved sponsor,” entrusted .with his custody under federal law. One ■ of the obligations of such a sponsor is to "make best efforts to establish legal guardianship with your local court within a reasonable time.” See Office of Refugee Resettlement Agreement, available at http://www.acf.hhs. gov/programs/orr/resource/unaccompanied-children7services. It has been fifteen months since the Office of Refugee Settlement placed B.R.C.M. with his godmother. The godmother has yet to fulfill that obligation.