KOZINSKI, Circuit Judge,
with whom Circuit Judges BEA and IKUTA join, concurring.
The majority analyzes this case as if it involved governmental conduct in the domestic sphere, but it doesn’t. The President and Congress have excluded an alien pursuant to their plenary power over immigration. The Supreme Court “has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens.” Demore v. Kim, 538 U.S. 510, 522, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). We thus owe far more deference here than in an ordinary domestic context. See Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977).
*1050 For well over a century, the Court has sharply curtailed review of laws governing the admission or exclusion of aliens under the plenary power doctrine. The Court has said that “over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.” Kleindienst v. Mandel, 408 U.S. 753, 766, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (quotation marks and alteration omitted). This is because the power to exclude or expel is “an inherent and inalienable right of every sovereign and independent nation.” Fong Yue Ting v. United States, 149 U.S. 698, 711, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). Such power is inherent because the very idea of nationhood requires the drawing of thorny lines—between members and non-members, between admitted and excluded. Our Constitution is the organizing document of a well-defined polity, not an international Golden Rule.
In recent years, the federal courts have been less than consistent in articulating the strength and scope of the plenary power doctrine. See Stephen H. Legomsky, Ten More Years of Plenary Power: Immigration, Congress, and the Courts, 22 Hastings Const. L. Q. 925, 930 (1995). Today’s opinion adds to the uncertainty by applying the domestic equal protection test to the sphere of foreign relations. That our circuit has made this error before, as the majority notes, is of no moment when we are sitting en banc. Our principal duty as an en banc court is to correct our circuit law when it has gone astray. I would overrule our precedent and hold that the government’s burden is even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications. See Fial-lo, 430 U.S. at 799, 97 S.Ct. 1473 (citing Mandel, 408 U.S. at 770, 92 S.Ct. 2576).[1]
One reason for the confusion in this area may be that courts have had difficulty articulating a standard below ordinary rational basis review, even though the existence of such a standard—call it “minimally rational basis”—ineluctably follows from the Supreme Court’s repeated insistence that Congress can “make rules as to aliens that would be unacceptable if applied to citizens.” Demore, 538 U.S. at 522, 123 S.Ct. 1708. What could the Supreme Court mean if not that something less than ordinary rational basis applies?[2]
*1051 The majority interprets section 1101(f)(1) as applying solely to conduct rather than medical status, and it reads the statute’s “good moral character” language to mean nothing. Such interpretive gerrymandering may be necessary to preserve the constitutionality of a statute that operates in the domestic sphere. But there’s no need to nip and tuck the text here. Congress can exclude Ledezma on account of a medical condition or it can do so because it considers him immoral. This is a facially legitimate exercise of Congress’s plenary power, and we have no business passing judgment on it.
Judge Watford’s deft concurrence shows why the difference in standards matters. I agree with him that the statute draws distinctions between aliens based on moral judgment.[3] But the discrimination here would be far more problematic if a legislature allocated public housing or Medicare only to those citizens with “good moral standing”—and conclusively excluded “habitual drunkards” from the eligible list. In my view, it’s the near limitless power of the political branches over immigration and foreign affairs that puts the statute here beyond cavil.
Untold masses were turned away at Ellis Island—or prevented from boarding ships for America—for medical reasons, my grandfather among them. This was a misfortune for those turned away, but ex-eluding aliens for reasons Congress believes sufficient to serve the public welfare is a nigh-unquestioned power of a sovereign nation. I’m aware of no country that fails to adhere to this precept. Nor has the Supreme Court stepped back from it. Until and unless it does, we have no business applying domestic equal protection law to political judgments—even foolish ones— made in the sphere of foreign relations. I would deny the petition summarily with a citation to Fiallo.

. Although Fiallo held that this standard is the most probing scrutiny we may apply to such laws, 430 U.S. at 795, 97 S.Ct. 1473, the Supreme Court expressly left open the question of whether some immigration laws “are so essentially political in character as to be nonjusticiable,” id. at 793 n.5, 97 S.Ct. 1473. Some Supreme Court cases can be read as so holding. See, e.g., Galvan v. Press, 347 U.S. 522, 530-31, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (noting that "a whole volume” of authorities. reject the proposition "that the Due Process Clause qualifies the scope of political discretion heretofore recognized as belonging to Congress in regulating the entry and deportation of aliens”); Lem Moon Sing v. United States, 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895) ("The power of congress to exclude aliens altogether ... and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.”).

. The literature scrutinizing scrutiny is vast. See, e.g., Tara Leigh Grove, Tiers of Scrutiny in a Hierarchical Judiciary, 14 Geo. J. L. & Pub. Pol’y 475 (2016); Vicki C. Jackson, Constitutional Law in an Age of Proportionality, 124 Yale L. J. 3094 (2015); Aziz Z. Huq, Tiers of Scrutiny in Enumerated Powers Jurisprudence, 80 U. Chi. L. Rev. 575 (2013). I believe our usual tiers—rational, intermediate and strict—are better understood as rough ordinal concepts rather than hermetically sealed categories that preempt the field. New categories can join this ordering; Strict scrutiny emerged in Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); intermediate scrutiny came in Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Other courts and commentators have *1051 hinted wryly at mythical creatures like "rational basis with bite,” "intermediate-intermediate scrutiny” and "strict scrutiny light.” See Kenji Yoshino, The New Equal Protection, 124 Harv. L. Rev. 747, 759 (2011); Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 791, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (Scalia, J., dissenting); Crawford v. Marion Cty. Election Bd., 472 F.3d 949, 954 (7th Cir. 2007) (Evans, J., dissenting). And while the "facially legitimate” standard sketched in Mandel and Fiallo is necessarily lower than ordinary rational basis, there may be other ways to describe this same conclusion. For example, I see no logical difference between saying that something less than ordinary rational basis applies and saying that the set of acceptable rational bases is broader in the immigration context than elsewhere.

. More broadly, I note that a medical diagnosis does not ipso facto innoculate one from moral judgment. Plenty of medical conditions, including alcoholism, are shaped by behavior our society deems volitional. How we evaluate this volitional component—and draw the line between determinism and free will—is a question of philosophy, not scientific inquiry. Morality does not end where diagnosis begins, and it’s scientific hubris to pretend otherwise.