**NATIONAL COUNCIL OF AMERICAN-SOVIET FRIENDSHIP, INC., Petitioner,**

**v.**

**SUBVERSIVE ACTIVITIES CONTROL BOARD, Respondent.**

**No. 13260.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 3, 1962.

Decided May 16, 1963.

Mr. David Rein, Washington, D. C., for petitioner.

Mrs. Lee B. Anderson, Attorney, Department of Justice, with whom Mr. Frank R. Hunter, Jr., General Counsel, Subversive Activities Control Board, Messrs. Kevin T. Maroney and George B. Searls, Attorneys, Department of Justice, and Messrs. Charles F. Dirlam and Peter P. Hanagan, Attorneys, Subversive Activities Control Board, were on the brief, for respondent.

Mr. Edward J. Ennis, New York City, filed a brief on behalf of American Civil Liberties Union, as amicus curiæ.

Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and DANAHER, Circuit Judge.

PRETTYMAN, Senior Circuit Judge.

This is a petition to review an order of the Subversive Activities Control Board, which, having held petitioner to be a Communist-front organization within the meaning of Section 3(4) of the Subversive Activities Control Act of 1950,[1] ordered it to register under Section 7 of that Act.[2]

Under the statute a Communist-front organization is one which (a) is substantially directed, dominated or controlled by a Communist-action organization and (b) is primarily operated for the purpose of giving aid and support to a Communist-action organization. It has been established[3] that the Communist Party of the United States is a Communist-action organization. The Attorney General of the United States alleged in the present proceeding that our present petitioner (National Council of American-Soviet Friendship, Inc.) is substantially directed, dominated or controlled by the Communist Party and is primarily operated for the purpose of giving aid and support to the Communist Party. Hearing was had, evidence received, findings made, and conclusions reached. The ultimate order of the Board was as we have indicated.

I

The first point made by the petitioner in its initial brief here is that the order of the Board is not supported by a preponderance of the evidence and that the order and findings are based upon incompetent and irrelevant evidence, distortions of the evidence, and failure to consider evidence favorable to petitioner. Upon argument counsel for petitioner said that none of the findings are supported by a preponderance of the evidence. The point raises difficult questions for the court in the performance of its duty of judicial review. The statute provides that "The findings of the Board as to the facts, if supported by the preponderance of the evidence, shall be conclusive." Section 14(a). The findings of the Board, including the appendices, are spread throughout 62 single-spaced, typewritten pages. The transcript of the testimony totals 5417 typewritten pages, and there are 300 exhibits, some of which are bound volumes and some are printed pamphlets; one exhibit has fifteen parts. The findings as recorded in the Report and Order of the Board were not annotated to the record. In its reply brief the petitioner listed specific findings as being without support in the evidence or as being contrary to the evidence. The Board later furnished for the assistance of the court copies of its Report and Order annotated to the transcript of testimony and the exhibits. Following oral argument the Government, at the court's request, filed a memorandum in which it made additional references to the transcript and the exhibits. Petitioner filed a memorandum in reply, setting forth other references, claiming that these portions of the record demonstrated that the findings of the Board were based upon hearsay, or ignored vital evidence, or were contrary to the evidence.

1. Tit. I, Internal Security Act of 1950, 64 Stat. 987, 989, as amended, 50 U.S.C. § 782(4).

2. 50 U.S.C. § 786.

3. Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

Quite obviously, as we pointed out in a pre-argument order in this case,[4] neither this division of three judges nor any one judge is going to read this entire transcript and the exhibits for the purpose of combing out the bits of relevant material evidence and fitting them to the respective issues of fact, some of them miniscular. That task is one for counsel. A mere reading of the transcript, even at a rate of 250 pages a day, would consume some 20 days, and the exhibits appear to be about as long. Even if a judge read all this raw material, allocation by him of the almost infinite particles of evidence to their proper places in the mosaic would be impossible and, as we conceive it, is no part of the judicial function. If the finder of the facts annotated his initial report to the record, this trouble would be avoided. And that is the way it ought to be done. But absent such an annotation a case of this sort must necessarily move one step beyond the usual petitioner's brief, respondent's brief, and limited replies restricted to alleged errors and such. The petitioner initially makes his claim of no-support; the respondent points to the claimed support; the petitioner then develops his position in the light of respondent's assertions. The petitioner's reply brief thus assumes a major place in the presentation. This course has been followed in the present case. The duty of the court in such a situation is to test the conflicting positions by referring to the cited portions of the record, and no more. We do not conceive it to be the duty of the court to examine other parts of the evidence or to attempt to find matter in support of either party's position not called to its attention by a party. It may do so, of course, but it is under no obligation to do so. We have restricted our consideration in this case to cited parts of the record, with some excursions into adjacent or related passages.

II

The purpose and plan of the statute must be in mind as we consider the evidentiary problems posed. We discussed this matter in detail in Labor Youth League v. Subversive Activities Control Board.[5] We repeat only in outline here. The scheme of the statute is as follows: The Act defines a Communist-front organization and directs the Attorney General to keep a register of these organizations. Section 9(a). It establishes a Board (Subversive Activities Control Board) and provides that, whenever the Attorney General believes that an organization which has not registered should register, he may file with the Board a petition for an order requiring the organization to register. Section 13(a). If the Board, after hearings (Section 13(c)), determines affirmatively it makes a report in writing and issues an order requiring the organization to register. Section 13(g) (1). The organization may obtain judicial review of the order by filing a petition in this court. If this court affirms the order or dismisses the petition for review, and no petition for certiorari is filed, the order of the Board becomes final.

The registration statement of a Communist-front organization must show the name and address of the organization, the name and last-known address of each officer of the organization (including those who were officers any time during the twelve months preceding the filing), an accounting of moneys received and expended during the preceding twelve months, etc. Section 7(d). The statute does not require that the registration statement of a Communist-front organization show the names of the members.

The Act provides that, when an organization is registered as a Communist front or a final order requiring registration is in effect, it shall be unlawful for

4. National Council, etc. v. Subversive Activities Control Bd., 112 U.S.App.D.C. 194, 301 F.2d 518 (1962).

5. 116 U.S.App.D.C. —, 322 F.2d 364 (1963).

any member of the organization (A), in seeking, accepting or holding employment under the United States, to fail to disclose the fact that he is a member of the organization; or (B) to hold any employment under the United States; or (C), in seeking, accepting or holding employment in any defense facility to fail to disclose the fact that he is a member of the organization (Section 5(a)): and further it shall be unlawful for a member of such an organization to make application for a passport or to use a passport (Section 6(a)). The penalties for violation of these provisions are a fine of not more than $10,000 or imprisonment for not more than five years, or both. Section 15(c), last sentence. As we point out in the Labor Youth case, supra, the theory of the statute respecting Communist fronts is that the Communists disguise their true objectives and foster organizations with declared objectives which are attractive. The statute recites that this practice draws support from persons who would not lend such support if they were aware of the true situation. Thus, almost by definition, many members of a Communist front are unsympathetic to Communist aims or Communist philosophy.

III

Before beginning a consideration of the disputed items of fact in detail, we emphasize two important general evidentiary requirements of the statute. First, the provisions of the statute are phrased in the present tense. The statutory definition of a Communist front is cast in the present tense. A Communist-front organization is one which *is* (not was or has been) substantially directed, etc., and *is* primarily operated, etc. The restrictions are upon those who are members when the organization is registered or the order requiring registration becomes final. And this would seem to be designedly so, because the public interest is in the activities of such organizations in the present and the potential future. This is not a punitive statute for past affairs. The question on this record and under the statute is whether this Council was a Communist-front organization at the time of the inquiry by the Board. This is an important factor in the case.

The second general evidentiary requirement of the statute is that a Communist-front organization is substantially directed, etc., by a Communist-action organization; it does not say by members of a Communist-action organization. This may appear to be a distinction without any material difference, but Congress has given major significance to the difference. This is the difference between the statutory definitions of a Communist-front and a Communist-infiltrated organization. Section 3(4A).[6] The former (a Communist front) is substantially dominated, directed or controlled "by a Communist-action organization". The other (Communist-infiltrated) is substantially directed, etc., "by an individual or individuals who are, or who within three years have been actively engaged in, giving aid or support to a Communist-action organization, a Communist foreign government, or the world Communist movement". The treatments accorded these two types of organizations differ drastically. A Communist-front organization must register; it can be directed by the Board to register; the Attorney General must keep a "Register of Communist-Front Organizations"; the organization must file annual reports; and heavy sanctions apply to the members of a Communist front. Such members may not apply for or hold Government jobs or jobs in defense facilities after the organization has been registered or required to register, and they may not make applications for or use passports. None of these provisions applies to Communist-infiltrated organizations. If the Attorney General be of the opinion that an organization is Communist infiltrated, he may file with the Board a petition for a determination to that effect. Section 13A. If the Board so determines, after hearing, and if the

6. Sec. 7(a), Communist Control Act of 1954, 68 Stat. 777, 50 U.S.C. § 782(4A).

organization is a labor organization or an employer, within the meaning of the National Labor Relations Act, the organization or the employer loses certain rights under that Act. Section 13A(h), (j). And that appears to be all that happens to a Communist-infiltrated organization.

Thus it is clear that the differences between the two definitions in the statute must be observed. The prescription that to be held a Communist front an organization must be dominated, etc., "by a Communist-action organization", rather than merely by individuals who are or have been actively engaged in or giving aid to Communist causes, is a material specification. The Communist-action organization involved in the present case is alleged to be the Communist Party. And so, in order to sustain the finding that our petitioner, the National Council of American-Soviet Friendship, is a Communist-front organization, the evidence must sustain a finding that it is directed, dominated or controlled by the Communist Party. If the evidence goes no further than to establish that the organization was directed, etc., by members of the Party or by persons active in support of Communist causes, the conclusion that it is a Communist front must fail.

IV

The Act did not leave the Board unassisted with the raw definition of a Communist front. It supplied some guidelines or aids. It directed that the Board "take into consideration the extent to which" four factual conditions exist. Section 13(f).[7] The two basic phrases in this directive—(1) "take into consideration" and (2) "the extent to which"—are notably not those of a formula. Nevertheless they definitely inject these four factual considerations into the Board's decisional process. The first of these prescriptions is that the Board shall take into consideration "the extent to which persons who are active in its management, direction, or supervision, whether or not holding office therein, are active in the management, direction, or supervision of, or as representatives of, any Communist-action organization". So that, in determining whether this petitioner organization is directed, etc., by the Communist Party, the Board must consider the extent to which persons who are active in its management are also active in the management, or as representatives, of the Communist Party.

The second *guiding prescription* in the statute (Section 13(f) (2)) is that the Board shall take into account the extent to which the organization derives its support from a Communist-action organization, a Communist foreign government, or the Communist world movement.

The two other statutory guidelines (Section 13(f) (3) and (4)) relate in terms to objectives and positions taken. We defer discussion of them to a later place in this opinion.

V

We come, then, to the case before us. The first problem is whether, by a preponderance of the proof, it is shown that petitioner (National Council of American-Soviet Friendship) is substantially

7. In substance the directive (Sec. 13(f)) is that the Board take into consideration the extent to which—

(1) persons active in the management of the respondent are similarly active in a Communist-action organization or as representatives of such an organization;

(2) the support of the respondent is derived from a Communist-action organization;

(3) the resources or personnel of the respondent are used to promote the objectives of a Communist-action organization; and

(4) the positions taken from time to time by the respondent on matters of policy do not deviate from those of a Communist-action organization.

(In each of these four subparagraphs a Communist foreign government and the world Communist movement are named, in addition to a Communist-action organization.)

directed, dominated or controlled by the Communist Party. There is no evidence —and the Board did not find—that the Party itself, through its governing body, in any formal way directed, etc., this Council during the period under review, or indeed at any other period. The Party itself, as such, did not issue orders or directives to the Council. The Government's contention—and the finding of the Board—is that the managing-directing figures in the Council are members or "functionaries" of the Party and that this fact establishes direction and control by the Party.

In its report the Board reasoned in the following fashion: Three of the four national officers of the Council in the years 1951–1953 were, respectively, an important member, a member, and an active functionary of the Party. The partisanship of the fourth and his activities in concert with Party members and functionaries are entirely consistent with Party domination of the Council. Twelve of the twenty-four remaining directors of the Council in 1953 were shown, the Board said, by uncontradicted evidence then to be, and to have been, Party members, and another was closely allied with Party activities. The Board said the evidence is convincing not only that Party members constitute a significant majority of respondent's national leadership but also that those who are members of the Party are the most active and important. The record is not complete as to the leadership of the chapters of the Council, but what evidence there is indicates the dominance and control of Communist Party members in the direction, supervision and control of the Council. Reverting to the Directors of the Council the Board's tabulation shows that, of the 25 to 36 directors in the several years 1943 through 1953, 15 to 20 belonged to the Communist Party. For each of those years, except 1947, one-half or more of the directors were shown to have been Party members. The continuous predominance of Communist Party members on the Board of Directors indicates that the present high number is not accidental. Most of the individuals who have been particularly important in the Council since its inception have been Party members. The Board discussed Bayer, Lamont, Morford and Melish. It said that instances of record where anyone carrying out significant activity in the Council was not identified as a Party member pale into insignificance in the total picture. Three witnesses who appeared for the Council had no evident significant influence. Two important members of the Committee of Women were members of the Party.

In answer to contentions made to it by the Council, the Board continued that it is pertinent to consider that the Communist Party maintains strict discipline over its members, and the evidence of three witnesses established that every Party member is a representative of the Party when he joins another organization and it is Party policy to control organizations through Party members.[8] The facts that the Party planned and created the Council and that Lamont (the first chairman), Bayer, and Jessica Smith became important officers in the Council give rise, in the absence of countervailing circumstances, to a presumption of intent and purpose to maintain dominancy over the Council through Party members. This purpose becomes established by considering additionally the complete identity of positions taken by the Council with those of the Party. Accordingly the Board concluded that Party members functioning in the Council are doing so in the capacity of Party representatives.

Next, the Council contended to the Board that membership in the Party on the part of various persons was not shown to have existed in recent times. To this the Board said that membership in the Party is presumed to continue until or unless the contrary is shown. Further, a number of the Council's leaders were selected for their positions by the

8. No record reference is furnished us on this point.

Party, or, stated differently, their activity in the Council was Party activity. Reasonable evaluation of the record, it is argued, requires a finding that those shown to have been Party members have continued to be Party members.

Thus reasoned the Board, and it found, upon the findings and the entire record, that the active leadership of the Council is carried out by functionaries and representatives of the Communist Party.

To the foregoing our petitioner, the Council, says: The statements of the Board that certain persons were shown to be members of the Communist Party are false; the evidence in some parts is hearsay and in some parts is misconstrued; cross-examination of witnesses is ignored; the fact, if it be a fact, that Council officers and some directors are Party members is not enough to sustain a conclusion that the Council is directed, dominated or controlled by the Communist Party.

The critical phase of the proof is the evidence presented by the Government to establish that those active in the management of the Council were active in the management of, or as representatives of, the Communist Party. These persons were the national officers and the directors of the Council. The evidence was directed at them separately and individually. We look at that evidence as we are given record references to it.

VI

As we approach this part of our task we inject a comment.

A finding that a person was a member of the Communist Party in 1951–53, and was active in its management or as its representative, is a serious business. It is serious to him and also serious to the public as potentially affecting its welfare, even its security. These years were after Congress had passed the Internal Security Act of 1950 and had declared the purpose of the Communist movement to be the establishment of a totalitarian dictatorship throughout the world, and had further declared that individuals who knowingly participate in that movement in effect repudiate their allegiance to the United States. Moreover a finding that these directors were members of the Communist Party is serious through a chain of circumstances to a considerable number of individuals who by statutory definition did not know these directors were Communist Party operatives. We therefore approach a decision of the disputed point with a conviction that, although the proof may be difficult to secure and to present, it must be specific, direct and timely. Otherwise, not only may injustice ensue, but the purposes of the Congress in this statute are not served.

VII

The four national officers of the Council in 1951–53 were named Kingsbury, Morford, Fairchild and Bayer. Kingsbury, the chairman, testified that he was not and had not been a member of the Party. The Board did not find to the contrary but held this to be of little moment, because his activities were entirely consistent with Party domination.

Morford was the executive director. The witness Budenz was handed a letterhead of the Council and asked to identify members of the Party. He named Morford among others. On cross-examination he said he met Morford, or saw him, in "an enlarged National Committee" of the Party meeting in 1943 or 1944. He said Morford was pointed out to him as one who was active in the Committee to abolish the poll tax.[9] The witness Clontz said he was told by a Party member "that I needn't worry about the loyalties of either Mr. Morford or Mr. Fairchild."[10] The witness Lautner testified explicitly that the National Committee was a large group attended by representatives of organizations other

9. Whether this Committee was of the Party or of the Council, or of either, was not explained.

10. What "loyalties" were meant was not explained on the record, but the Board interpolates "Party" in its finding, making the evidence read "Party loyalties".

than the Party, but he later confused his statement by saying that these meetings were "open only to Party leadership". While the evidence just outlined indicates that Morford was probably a member of the Party, it by no means proves that he was. On the other hand, his attendance at the National Committee may be enough to support an inference that he was a Party member.

Fairchild was national secretary of the Council and had been since 1946. The witness Budenz named him as a member of the Communist Party when shown a Council letterhead. On cross-examination he said he had met Fairchild maybe a dozen times at his (Fairchild's) office. The first time was in 1940, at which time Dr. Fairchild said "he had cooperated in a number of Communist-created organizations on the Spanish question". Thereafter the witness saw Fairchild a number of times, once about a draft exemption for the foreign editor of the Daily Worker, Dr. Fairchild being Chairman of the Draft Board in the area around Union Square.[11] Other meetings had to do with Communist-created organizations, of a great many of which Dr. Fairchild had been a member. The witness could not recall these meetings. On redirect Budenz was asked directly to state "the basis of your testimony as to the Communist Party membership of Henry Pratt Fairchild". He replied, "Henry Pratt Fairchild was repeatedly called to my attention in official instructions in regard to his association with a number of Communist-created organizations, including the National Council, by V. J. Jerome and Alexander Trachtenberg, and also in 1944 and 1945 by Jack Stachel for my direction in conducting the Daily Worker." The witness Clontz testified, as we have indicated, that he was told that Dr. Fairchild was "loyal". We think this evidence was not sufficient to prove Dr. Fairchild a member of the Party; certainly not in 1951–53.

Bayer was executive secretary of the Council at the time of the hearing. Bedenz identified him as being present at a Politburo[12] meeting in 1942, at which, Budenz said, plans were formulated for the creation of the Council. Bayer said nothing at the meeting, but Trachtenberg was reported as having said that after the formation of the Council Bayer would be the agency of continual contact between it and the Party. The witness Lautner testified that Bayer told him that he (Bayer) and two others had come over together from the Socialist Party to the Communist Party. The witness Clontz related an incident during which he was told by one Wilkerson that "Bayer was an old man in the Party and as such was a privileged character." Kornfeder stated he knew Bayer "from the Party" but had never spoken to him, as he recalled. Denver, a New York police sergeant assigned to undercover work in the Party, was asked if he knew Bayer to be a Communist. He answered, "He was."

Disregarding the hearsay, we think two features of the testimony concerning Bayer—his presence at the Politburo meeting and his own statement quoted by

11. The exemption was not granted.

12. There is no statement in the report nor any references to the record which show the makeup of the Politburo at the time the discussions concerning the creation of the Council were held. Budenz did testify that the Politburo was the popular name of the National Board of the Party. It consisted of from six to fifteen individuals, depending upon the "needs of the Communist Party", and it carried out the day-to-day supervision of Party activities. The National *Committee* was apparently the policy-making body of the Party, consisting of fifty to sixty persons meeting approximately four times a year in "Extraordinary Plenums", at which 100 to 300 other active Communists were in attendance. The meeting of the Politburo held in the Spring of 1942 involved four identified members of that body and two identified non-members. Trachtenberg and Bayer. From the fact that Bayer was not a member of the Politburo or, apparently, of the National Committee, it is arguable that he was not a person "active in the management, direction, or supervision of, or as [a representative] of," the Party.

Lautner—justified an inference that he was a member of the Party.

VIII

The Board appended to its Report and Order a list of the directors of the Council throughout all the years 1944–53 who were said to have been shown to be members of the Communist Party. This appendix showed the names of these directors, the years in which each was a director, and the name or names of the witness or witnesses who are said to have identified each as a member of the Party. The Government annotated this appendix with record references, and our petitioner supplied us with other references. We have examined these portions of the record and some other related parts.

This evidence as to Party membership, with small exceptions, related to periods prior to 1951–53, in most part long prior thereto. The events and circumstances from which Party membership was deduced were in prior years. The witnesses, except two, who testified on this phase of the case left the Party in 1950 or prior thereto. Budenz left the Party in October, 1945; Kornfeder left in 1934; Denver was expelled in 1942; Horvath left in 1947 and Fletcher in 1946; Lautner was expelled in January, 1950, and Malkin in 1937.

The Board bridges the gap between the time of its proof and the critical period under inquiry with the presumption that Communist Party membership, once established and not disestablished by proof, is presumed to continue. And of course in ordinary circumstances that is a valid presumption. The past is frequently, indeed usually, probative of the present.[13] But here we have an unusual situation. Is a person who was a member of the Communist Party in 1942 or 1944 to be presumed to remain a member in 1951–53? The former years were war years, in which the United States vigorously sought the continued help and support of Soviet Russia. Friendship and friendly activities toward the Soviet were among the highest official government policies. A total of 46,251 votes were recorded as having been cast in 21 states for the Communist Party candidate for President, Earl Browder, in the election of 1940.[14] The situation reversed itself. In 1950 the Congress passed the Security Act and made the declarations to which we have referred.[15] To presume that merely because a person was a Party member in the years of the war he continued to be a member after 1950, paying dues and subject to Party discipline, would be unrealistic, contrary to the probable factual situation, and indeed unjust.

The next notable feature of the evidence concerning the directors of the Council is that at the most it shows Party membership as to a number of them. There is no evidence, except perhaps as to Bayer, that they were active in the management of, or as representatives of, the Party. Nothing appears as to their active part in the direction or management of the Party. Members, "fellow travelers", ideological comrades,—these may have been indicated; but the Communist Party appears, and was declared by the Congress,[16] to be a rigidly disciplined, well-organized, active organization. Its management is real, not happenstance, and its representation is definite, not whimsical. Mere membership does not establish active management or responsible representative capacity.

13. See Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 86–87, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); 96 U.S.App.D.C. 66, 105, 223 F.2d 531, 570 (D.C.Cir. 1954).

14. Statistics of the Presidential and Congressional election of November 5, 1940, compiled from official sources by Leroy D. Brandon under the direction of South Trimble, Clerk of the House of Representatives, pp. 37–38.

15. Sec. 2(1) and (9), Subversive Activities Control Act of 1950, 64 Stat. 987–988, 50 U.S.C. § 781(1) and (9).

16. Sec. 2(15), Subversive Activities Control Act of 1950, 64 Stat. 989, 50 U.S.C. § 781(15).

The Board found that several of these directors were "functionaries" of the Party. The only definition or explanation of that term we found in the record is in the testimony of the Government witness Clontz. He said that a Party functionary is a professional revolutionist, "a guy who works full time for the Communist Party in a position of extreme responsibility." We find no evidence, in the references given us, tending to place any of these directors in that category.

The question here is not whether the Council is Communist-infiltrated. If that were the question, a crucial point would be whether these directors were members of the Party. But the question here is whether it is a Communist front. We have pointed out the difference and the importance of that difference. The crucial inquiry in respect to a Communist front is whether it is directed or controlled by the Party. The fact which the Board is directed by the statute to take into consideration is the extent to which these people were active in the management of, or as representatives of, the Party. That is the point to be proved.

The Board overcomes the lack of proof on the point by finding that under Party discipline all members act as representatives. But we think that presumption is unrealistic and, moreover, would destroy the very important difference which the statute makes between management or direction by members of the Party and management or direction by those active as representatives of the Party; that is, the difference between Communist front and Communist infiltration. The statutory provisions seem to make clear that it contemplates that representatives are something more than mere members.

Thus we come to the third feature of this evidence which presses itself upon our consideration. That is the nature of the evidence itself.

The appendix to the Board's report indicated that of those persons who had been directors of the Council in various years from 1944 to 1953, thirty were shown to be members of the Party. The Board found that 16 of the 31 directors in 1951 and 15 of the 28 in 1953 were shown by the evidence to have been Party members. The principal witness on the subject was the witness Budenz. He had been a member of the Party and held important posts in it, being for some years editor of the Daily Worker. He left the Party in October, 1945. On the witness stand he was shown letterheads of the Council which listed the officers and directors. He was asked to name those he could identify as members of the Communist Party. He named twenty-four. At other places in his testimony he also identified four others as Communists. On cross-examination he was asked, as to each of twenty-five of those people, whether he had ever met or spoken to them. As to some he said he had, and as to some he said he had not. Then on redirect Government counsel directed his attention, separately by name, to thirteen of the twenty-eight he had identified, and he was asked to state as to each the basis of his knowledge of that person's Party membership. As to each he replied that he had been told, orally or in an "official communication", by Party members (generally among the Party managers) that the person was a member of the Party. He explained that this information was given him for Party purposes in his capacity as editor of the Daily Worker, in order to carry out his duties as a Communist.

On recross by the attorney for the Council, Budenz was asked as to each of several informants whether they had told him whether they (the informants) had ever met the individuals named, and whether the informants had told him who told them that the named individuals were members of the Communist Party. Budenz's replies were negative. The line of questioning was brought to a close by the examining attorney with the succinct statement that in connection with all these people "whoever it was who told you about it did not tell you where they learned it" and in general did not say that they had met with these indi-

viduals. Budenz agreed that this summation was correct.

Of the thirty whose names were on the Board's appendix as Party members, Budenz identified twenty-eight, and he alone identified fourteen of them. He testified he had never met seven of these fourteen. Of the thirty on the appendix list, thirteen left their directorships in 1950 or earlier. Thus seventeen alleged Party members are listed by the Board as among the directors of the Council in 1951 or later. Budenz identified all of these seventeen as being members of the Party, and he alone identified seven of them. He said he had never met three of these seven. He identified director Goldberg from the letterhead as a member of the Party but never stated the basis of his knowledge. He met Goldberg once in 1940 at a party in a comrade's apartment. He did not know whether Goldberg was widely known as a columnist for a New York newspaper. He similarly identified, without explanation, director Graham, and said simply that he had never met him. He similarly identified director Benson and said he had never met him. He said he met director Weber in 1942 or 1943 in connection with an article that was being carried about him; he was introduced as a Communist artist. No other explanation was given for the assertion of Party membership. Director Hunton wrote a column for the Daily Worker and apparently was a member of the National Negro Commission of the Party. One director (Marshall) personally confirmed the direct statement that he was a member of the Party.

Director Selly was identified by Budenz and by the witness Malkin, who was expelled from the Party in 1937; he made the positive statement that Selly was a member of the Party. Budenz said Selly expressed to him pleasure at being "joined up with us". Director Edwin S. Smith was identified by Budenz and the witness Fletcher, the former testifying that Smith told him directly that he was a Party member. Director Struick was identified by Budenz (who said he had never met him) and by the witness Glatis, who said that Struick was chairman of the Massachusetts Chapter of the National Council and, since Glatis knew this to be a Communist organization, he therefore knew Struick was a Communist. Director Draper was identified by the witness Budenz and by the witnesses Lautner and Malkin. Budenz said he met Mrs. Draper several times and that she was called to his attention on account of her interest in Communist activities in Spain and her activities for the Communist Party among people of wealth and influence. Lautner merely stated that Mrs. Draper was a Party member, and the witness Malkin testified that she was active in the Party during the time of his membership (prior to 1937). We have discussed the evidence presented relating to Dr. Fairchild, Mr. Morford and Mr. Bayer. The evidence which we have described in detail reflects the character of all the evidence by which these directors were identified as Communist Party members.

Much of this evidence was hearsay, which, in view of the nature of the ultimate determination the Board was bound to make, we cannot accept as adequate proof. Many facets of the hearsay rule itself are hotly debated, and exceptions to it are well established.[17] But application of the rule under ordinary factual circumstances has long been established as part of due process. Professor Wigmore summarizes the bases for exceptions as being two, Necessity and the Circumstantial Probability of Trustworthiness. And in administrative agency hearings, flexible as they are, the rule may be more relaxed than it is in the stricter atmosphere of judicial proceedings. Hearsay may acquire adequate weight when it is buttressed with other evidence, or reflects common knowledge, or its character as hearsay is a pure technicality, or the fact to which it relates is

17. See Wigmore's discussion (5 Wigmore, Evidence § 1360 et seq. (3d ed. 1940)), including the list of articles shown in the addendum to Note 1 of § 1427, as it appears in the Pocket Supplement.

relatively insignificant or minor. But at other times hearsay involves circumstances and considerations the impact of which will turn upon the governmental function to be executed, what, if any, restrictions or punishment may follow, whether the rights are public and general or purely personal, and similar incidents. We are close to the problems so vigorously explored by the Supreme Court in recent years.[18] But we need not, and do not, intrude upon any of these debatable areas. The fact here sought to be proved was specific—the membership of a named individual in a named organization. Even though that be deemed to be a subjective fact, it must be proved by objective criteria and circumstances.[19] Those circumstances were known to some, possibly many, persons. The purported informer was named. There was no necessity for the acceptance of the hearsay route. No probability of trustworthiness clung about the statement. The purpose sought to be achieved was a formal, and finally a judicial, establishment of the fact involved. Aside from the technical requirements into which the rule is so often cast, this evidence is basically lacking in the weight it must be shown to possess to meet the standards we deem applicable here and to meet the test of substantiality as to which the Congress was very clear.

The question whether these officers and directors were members of the Communist Party was a major material issue in the proceeding. The rudimentary elements of justice deny that a person can be found formally and officially to be a member of the Communist Party merely upon the statement of one person that another person told him so. The party membership of these individuals

was not only a *sine qua non* of the Government's case in respect to this petitioner, but a judicial determination to that effect carries serious ancillary effects. The named individuals, if determined to be members of the Communist Party, must be registered and, if registered, cannot hold Government jobs or get a passport. All members of the petitioner organization, if it is validly found to be a Communist front, are subject to the same serious restrictions. Finding these individuals to be Party members is not the mere assignment of a colloquial appellation. The imagination runs riot if we contemplate the results of a ruling that, if a highly placed member or officer of some organization says so-and-so is a member of that entity, such a statement relayed to the witness stand by a third person, without more, is acceptable proof of the fact of membership. Promoters are notoriously optimistic about the membership and members of the organizations they sponsor.

Apart from the hearsay another feature of this type of evidence impels notice. Much of it, as the foregoing sketch indicates, consists of a simple statement, sometimes by one and sometimes by more than one witness, that the named individual is a member of the Communist Party. No explanation of the mode or means by which the witness acquired that information was given in these instances. In other instances an explanation was forthcoming on cross or redirect examination. Of course an explanation—the question "Why?"—could be sought on cross. But we are all familiar with the reluctance of trial counsel to strengthen his opponent's case by such inquiry, and there is no burden upon him to do so.

18. See Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); and see, e. g., Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (especially the concurring opinions of Mr. Justice Frankfurter, 341 U.S. at 165–174, 71 S.Ct. at 645–650, Mr. Justice Douglas, 341 U.S. at 174–183, 71 S.Ct. at 650–654, and Mr. Justice Jackson, 341 U.S. at

183–187, 71 S.Ct. at 654–656); and Cafeteria and Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 894–899, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Cf. Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954).

19. Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

The problem here is whether such a naked assertion is sufficient to meet the statutory requirement of the "preponderance of the proof". This term means something more than the term "substantial evidence", sometimes used by the Congress and frequently by courts. In the bill which was predecessor to this statute, the House specifically, upon motion of Representative Nixon and after debate, changed "substantial evidence" to "preponderance of the evidence" as "an additional safeguard".[20] We are of the view that the term means that the evidence must be substantial and moreover must preponderate. The evidence itself must have qualities of substance and also must outweigh the contrary evidence. In respect of administrative proceedings the Supreme Court held in the Consolidated Edison case:[21] "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." And Judge Bratton, writing for himself and Judge Murrah in the Utah Copper Co. case,[22] said: "It means relevant evidence of the kind and quantum which a reasonable mind might accept as an adequate basis for a conclusion." The court held the evidence in that case to be substantial under that definition. Judge Orie Phillips dissented, saying that the evidence was not substantial. He was of the view that the statements of foremen, made in violation of positive instructions, publicized and well known, had no probative value and did not constitute substantial evidence as to the attitude of the employer.

It seems to us that a reasonable mind could not accept as adequate support for a conclusion that a named person was a member of the Communist Party in 1951–53, merely an unexplained and unsupported statement of a witness, or of several witnesses, that he or they knew the person to be a Party member. Such evidence does not meet the test of "substantial" evidence.

Other of this evidence consists of statements that the named director was interested in Communist causes. This, of course, was not proof that the person was a member of the Communist Party, much less proof that he was a functionary of the Party.

We think there was enough evidence to support the Board's finding that Bayer, Marshall, Selly and Edwin S. Smith were Party members.[23] There was evidence which might be construed as showing that Jessica Smith and Collins were members. Jessica Smith repeatedly attended National Committee meetings, and Collins was a speaker at closed Party meetings. These were six of 31 di-

20. 94 Cong.Rec. 6134–6137 (1948). In respect to this statute Rep. Nixon told the House: "* * * in this bill we provide that when an organization which has been found by the Subversive Activities Control Board to be a Communist front or a Communist-action organization makes its appeal to the court, the court on appeal must find that the decision by the board is sustained by a preponderance of the evidence, a standard which I may say goes much further than any law on the books at the present time governing appeals from administrative bodies.

"I should at this point say that the reason we did this was that we recognized we were dealing here in a field which should be distinguished from legislation affecting property rights, and we felt it was essential to give every possible procedural guaranty to the individuals or organizations involved." 96 Cong.Rec. 13765 (1950).

And Senator Ferguson told the Senate: "Not just a scintilla of evidence will suffice, nor will mere substantial evidence support the Board in its findings. It must be the preponderance of evidence, as contained in the full record." 96 Cong. Rec. 14531 (1950).

21. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

22. Utah Copper Co. v. National Labor Relations Board, 139 F.2d 788, 790 (10th Cir. 1943), cert. denied, Independent Ass'n of Mill Workers v. National Labor Relations Board, 322 U.S. 731, 64 S. Ct. 946, 88 L.Ed. 1566 (1944).

23. The last-named director is not listed after 1951.

rectors and officers in 1951 and five of 28 in 1953.

The point sought to be proved by this evidence is the extent to which the directors of the Council are (that is, in 1951–53, the years immediately preceding the hearing) active in the management, direction or supervision of, or as representatives of, the Communist Party. We are of opinion that this extent, as shown by material, probative evidence in this record, is negligible. We are impelled to this conclusion by the three considerations we have stated: (1) the failure to relate the proof to the critical period of time; (2) the failure to prove that the managers of the Council were active in the management of, or as representatives of, the Party; and (3) the insubstantial nature of the evidence, or most of it, as proof.

IX

The Board lays stress upon the organization of the Council as supporting the view that it was Communist dominated. The evidence in that respect was a description, given by Budenz, who was present, of a meeting in 1942 of members of the Politburo and others. He said the organization of the National Council of American-Soviet Friendship, as the successor to previously existing bodies, was discussed and determined upon; that a chairman, Mr. Corliss Lamont, was named and operating personnel for a mass meeting arranged; that the events thus arranged came to pass; and that out of a mass meeting, held in Madison Square Garden November 7 and 8, 1942, came the Council. On the other hand there is evidence that a forthcoming Congress of American-Soviet Friendship, to be held in the then-near future, was first announced, with widespread official government enthusiasm, at a large party at the home of the Honorable Joseph E. Davies, distinguished Ambassador of the United States to Belgium and to Russia. The Congress thus announced was inaugurated at a gigantic two-day mass meeting in Madison Square Garden on November 7th and 8th. Mr. Davies was Honorary Chairman and made the opening speech. The Vice President of the United States made a speech entitled "A Tribute to Russia". President Roosevelt conveyed "my best wishes for the success of the Congress of American-Soviet Friendship".

The Council was thus, then and there launched, under the sponsorship of leaders not only in Government but in business, labor, and other segments of the Nation. They included such people as the Secretary of State, the Secretary of the Treasury, the Secretary of Commerce, the Honorable Paul V. McNutt, the Honorable Edward R. Stettinius, the Honorable W. Averell Harriman, Governor Lehman of New York, Mayor LaGuardia of New York City, the President of the A.F. of L. and the Vice President of the C.I.O., Lieutenant General McNair, numerous other governors and mayors, the Honorable Homer Cummings, Judge Learned Hand, the Honorable Owen D. Young, and several hundred other persons prominent in the Nation.

We are not given in this record the connecting link, if there be one, between the meeting of the Politburo and the meeting at Madison Square Garden. But, even if we assume that the Politburo conceived and arranged the mass meeting, we cannot draw from the launching of the Council at a mass meeting of this character an inference or presumption that the Council was dominated, controlled or directed by the Communist Party in 1951–53.

X

The second factual criterion the Board must take into consideration is "the extent to which [the organization's] support, financial or otherwise, is derived from any Communist-action organization". Section 13(f) (2). The evidence as to support was supplied chiefly by Budenz. He was asked whether finances of the Council were discussed at Politburo meetings. He stated that discussions did take place, centering around Party support through seeing that mem-

bers of the Party attended mass meetings and cooperated in the raising of funds. He also said the Party was to be responsible for any initial funds required for the Council, through the instrumentality of one Robert William Weiner, and that Weiner "supervised" the finances of the National Council in the sense that "he reported in regard to his activities, to the Politburo." He also identified one Harriet Lucy Moore as having been "assigned by the Politburo" to cooperate with Jessica Smith in publicizing the Council, and as a "consultant" on those matters. He also said the Party provided speakers, although only on a few occasions. He further testified that as managing editor of the Daily Worker he was directed to "play up" respondent's rallies and that in his own branch of the Party directives came down to get out large participation at these affairs.

The testimony as to Miss Moore and Weiner was subject to scrutiny on cross-examination. When asked whether he knew if the Party had actually provided any of the Council's initial funds, Budenz stated: "Not that I am aware of. That went through the hands of [Weiner]." When asked whether he recalled that Weiner ever actually made a report to the Politburo concerning the Council's finances, his answer was "No." He knew that the Party "did stimulate local organizations to support the Council." Concerning Moore, Budenz was asked on cross-examination whether she held any office in the Council, whether she "was ever made a consultant", and whether he ever spoke directly to her concerning the Council.[24] He either had no direct knowledge or answered "No" to each of these inquiries. He had heard from Jack Stachel that she had been made a consultant. He said: "Well, Mr. Stachel advised me that Miss Moore was going to cooperate with the National Council on Soviet-American Friendship in organizing its publicity as a consultant in developing the organization for the time being, until it got on its feet and was in full bloom, and that she was going to work with Jessica Smith in that capacity; of course, all this subject to the officers or at least in cooperation with the officers." There was no direct testimony in the references given us that Moore ever carried out the recommended assignment.

Despite the dubious value of the above evidence in regard to Moore and Weiner, the Board nevertheless drew the following conclusions:

> "* * * The Politburo put into the hands of one Robert Weiner, a Party member active in the financial affairs of the Party, the matter of respondent's finances. He reported back to the Politburo with reference to this activity in connection with respondent. * * *
>
> "* * * Another example of Party support established by the witness Budenz was that about 1943, the Politburo assigned one Harriet Lucy Moore to cooperate with Jessica Smith as a sort of consultant on the broadening of the Council and publicizing it."

The Board states in a footnote that "There was also evidence of record indicating, without contradiction, that the Party assisted respondent by providing speakers for its functions." The evidence as to this point was, again, provided by Budenz. He was asked on cross if he could state when the Party assisted the Council in getting speakers. He mentioned Mr. Davies, Senator Pepper, and the Dean of Canterbury; as to the former two he could not identify who approached them, and in the case of Senator Pepper he could not recall what meeting he was to have addressed nor the year in which the event occurred. As to the Dean of Canterbury there is conflicting evidence, some provided through deposition by the Dean himself,

24. The question was particularly appropriate since, if Budenz was directed to publicize the Council, one obvious person to contact in reference to publicity would be the person whom the Party appointed to assist directly in that task.

as to who actually made the arrangements. When asked if he knew of any other speakers that the Party assisted the Council in getting, Budenz replied, "I do not recall specifically, no."

There was testimony by several witnesses that the Daily Worker publicized petitioner's meetings, and that the Party encouraged, perhaps even ordered, its membership to attend and support the mass meetings held by petitioner. However, and as petitioner urges, "the Board makes no finding that the support given by attendance of Party members at the meetings was substantial."

The foregoing résumé indicates the extent to which the Council derived support, financial or otherwise, from the Communist Party. It seems to us that the support proven by the record references given us is not substantial enough to constitute a material factor in establishing Party domination. In other words, the weight of the proven support in the scale on the basic question of domination, direction and control by the Party is minor.

XI

We think the Board's conclusion that the National Council is directed, dominated or controlled by the Communist Party of the United States is not supported by a preponderance of probative evidence on this record.

XII

We come, then, to the second part of the statutory definition of a Communist-front organization. It is that the organization "is primarily operated for the purpose of giving aid and support to a Communist-action organization, a Communist foreign government, or the world Communist movement".[25]

The fact that both the Party and the Council favored world peace and worked for its attainment is of no significance in our problem. Many organizations and millions of people in this country strive and pray for that objective. The significant fact in this respect is the content of the pronouncements by the Party and the Council in supporting the objective. The Council, in its publications, vigorously and repeatedly advanced the thesis that Soviet Russia is the great proponent of peace, while the foreign policy of the United States, dominated by Wall Street imperialists, incites to war. These are habitual themes of the Communist Party. This coincidence of attitude, tone and expression runs through the discussions of the Marshall Plan, N.A.T.O., the Truman Doctrine, the Korean War, China, Germany, the atom bomb, Greece, Turkey. It appears from the exhibits that both the Party and the Council characterized the United States as imperialistic, warmongering, not wanting peace, not offering the possibility of peaceful coexistence. This line of approach is not a usual approach with people or organizations in this country fervently advocating world peace. It does appear that an objective of the Communist Party is to create such an image of the United States in the minds of all people. However, in view of our disposition of the case upon the first part of the statutory definition, we need not pursue an evaluation of the finding upon this second part.

25. Two of the four previously mentioned factual considerations in Section 13(f) seemingly apply to this part of the definition of a Communist front, i. e.:

"(f) In determining whether any organization is a 'Communist-front organization', the Board shall take into consideration—

* * * * *

"(3) the extent to which its funds, resources, or personnel are used to further or promote the objectives of any Communist-action organization, Communist foreign government, or the world Communist movement referred to in section 2; and

"(4) the extent to which the positions taken or advanced by it from time to time on matters of policy do not deviate from those of any Communist-action organization, Communist foreign government, or the world Communist movement referred to in section 2."

## XIII

Petitioner makes several constitutional claims based on the First and Fifth Amendments. The Supreme Court cautioned in 1956: "[The] non-constitutional issue must be met at the outset, because the case must be decided on a non-constitutional issue, if the record calls for it, without reaching constitutional problems." [26] In specific respect to the First Amendment point there made, the Court made these statements in the second Communist Party case: "The Subversive Activities Control Act is a regulatory, not a prohibitory statute. It does not make unlawful pursuit of the objectives which § 2 defines." [27] "The present statute does not, of course, attach the registration requirement to the incident of speech, but to the incidents of foreign domination and of operation to advance the objectives of the world Communist movement—operation which, the Board has found here, includes extensive, long-continuing organizational, as well as 'speech,' activity." [28] "There is no attempt here to impose stifling obligations upon the proponents of a particular political creed as such, or even to check the importation of particular political ideas from abroad for propagation here. The Act compels the registration of organized groups which have been made the instruments of a long-continued, systematic, disciplined activity directed by a foreign power and purposing to overthrow existing government in this country." [29]

Since in our view of the case it can be decided upon non-constitutional grounds, we do not pass upon the foregoing and other constitutional points pressed upon us by our petitioner, such as questions of the vagueness of the statute and self-incrimination.

## XIV

Petitioner also argues that the finding in the Communist Party case that the Party is a Communist-action organization is not binding in this proceeding. We think the point is not well taken.

## XV

 We deplore the length of this opinion. But the case is of first impression, the issues are in principal part factual, the record is long, and the interests of the parties, both of the Government on the part of the public and of the Council on the part of its members and others similarly situated, are of prime importance. We felt it necessary to examine the many references given us, to consider the many contentions made, and to state in some detail the bases for our conclusions.

The order of the Board must be set aside for failure of the Government to establish by a preponderance [30] of evidence the first requisite in the statutory definition of a Communist front, i. e., that the organization was at the time of the hearing substantially directed, dominated or controlled by a Communist-action organization, a Communist foreign government, or the world Communist movement.

So ordered.

26. Communist Party of the United States v. Subversive Activities Control Board, 351 U.S. 115, 122, 76 S.Ct. 663, 100 L. Ed. 1003.

27. Supra note 3, at p. 56 of 367 U.S., at p. 1389 of 81 S.Ct.

28. Id. at p. 90 of 367 U.S., at p. 1407 of 81 S.Ct.

29. Id. at pp. 104–105 of 367 U.S., at pp. 1414–1415 of 81 S.Ct.

30. See note 20, supra, and the accompanying text, p. 388.